UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | | |
|---|---|---|
| NICOLE BALTES, JEANNE FRANKS, | ) | |
| ABBY HARE, BREANNE PAULIK, | ) | |
| TALAINA PINKERTON, | ) | |
| DARCY SLADE, DANIELLE SNYDER, | ) | |
| and CARRIE ZOOK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:20-cv-67 JVB-JPK |
| v. | ) | |
| | ) | |
| WHITE COUNTY, WHITE COUNTY | ) | |
| SHERIFF'S DEPARTMENT, | ) | |
| BILL BROOKS, DAVID ROTH, | ) | |
| EVAN MORROW, RYAN GLOVER, | ) | |
| PATRICK SHAFER and | ) | |
| MARK HELMS, | ) | |
| | ) | |
| Defendants. | ) | |

## ANSWER AND AFFIRMATIVE DEFENSES (DEFENDANTS WHITE COUNTY, WHITE COUNTY SHERIFF'S DEPT., BROOKS, ROTH, MORROW, GLOVER, HELMS)

Come now the defendants, White County, White County Sheriff's Department, Bill Brooks, David Roth, Evan Morrow, Ryan Glover and Mark Helms, and for their answer and affirmative defenses to the complaint state as follows:

## INTRODUCTION

1.     On January 4, 2019, teachers arrived at Meadowlawn Elementary School anticipating a professional development day. Most brought pens and paper, expecting to take notes. Instead, they were repeatedly attacked by law enforcement officers without explanation or warning. As part of what was ostensibly an active-shooter training, the teachers were struck by high-velocity plastic bullets and subjected to verbal threats, expletives, and screaming. The teachers displayed obvious signs of anguish and physical pain, but were humiliated to find the law

enforcement officers joking and laughing at them. The terrifying and inexplicable experience left the teachers with lasting physical and emotional injuries.

**ANSWER:**   Defendants admit teachers were at Meadowlawn Elementary School on January 4, 2019 for ALICE training.  Remaining allegations contained in paragraph 1 are denied.

2.       This action seeks to vindicate Plaintiffs' rights under the U.S. Constitution and the common law of the State of Indiana. Defendants' violation of those rights has caused Plaintiffs lasting harm, for which compensation is now sought.

**ANSWER:**   Defendants deny the allegations contained in paragraph 2.

## PARTIES

3.       Plaintiff Nicole Baltes taught kindergarten at Meadowlawn Elementary School in White County, Indiana. Ms. Baltes held this position during the time of the events described in this Complaint, up until the end of the 2019-2020 school year, when she left to teach in a different school district.

**ANSWER:**   Defendants have no knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 3 and neither admit nor deny the allegations but demand strict proof thereof.

4.       Plaintiff Jeanne Franks taught first grade at Meadowlawn during the time of the events described in this Complaint, up until the end of the 2018-2019 school year when Defendants' actions, described herein, were a substantial factor in her decision to retire several years earlier than planned.

**ANSWER:**   Defendants deny the ALICE training was a substantial factor  in plaintiff Franks's decision to retire early.  As to remaining allegations defendants have no knowledge sufficient to form a belief as to those allegations and demand strict proof thereof.

5.      Plaintiff Abby Hare taught fourth grade at Meadowlawn during the time of the events described in this Complaint, up until the end of the 2018-2019 school year when Defendants' actions, described herein, caused her to resign.

**ANSWER:**   Defendants deny ALICE training  caused plaintiff Hare to resign.  As to remaining allegations contained in paragraph 5 defendants have no knowledge sufficient to form a belief as to the truth of those allegations and demand strict proof thereof.

6.      Plaintiff Darcy Slade taught in a self-contained classroom at Meadowlawn that serves students of various ages who have been identified as demonstrating behavioral challenges. Ms. Slade held this position during the time of the events described in this Complaint, up until the end of the 2018-2019 school year. Defendants' actions, described herein, caused Ms. Slade to decide to leave Meadowlawn. Before Ms. Slade took action on her decision, however, the school district re-organized its staff and she was transferred to another school as a result of the re-organization.

**ANSWER:**   Defendants deny ALICE training caused plaintiff Slade to decide to leave Meadowlawn Elementary School.   As to remaining allegations contained in paragraph 6 defendants have no knowledge sufficient to form a belief as to the truth of those allegations and demand strict proof thereof.

7.      Plaintiff Breanne Paulik taught fifth grade at Meadowlawn during the time of the events described in this Complaint, up until the end of the 2019-2020 school year, when she left to teach in a different school district.

**ANSWER:**   Defendants have no knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 7 and neither admit nor deny the allegations but demand strict proof thereof.

8.      Plaintiff Talaina Pinkerton taught first grade at Meadowlawn during the time of the events described in this Complaint, up until the end of the 2019-2020 school year, when she left to teach in a different school district.

**ANSWER:**   Defendants have no knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 8 and neither admit nor deny the allegations but demand strict proof thereof.

9.   Plaintiff Danielle Snyder currently teaches fifth grade at Meadowlawn. Ms. Snyder held this position during the time of the events described in this Complaint.

**ANSWER:**   Defendants have no knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 9 and neither admit nor deny the allegations but demand strict proof thereof.

10.   Plaintiff Carrie Zook currently teaches fifth grade at Meadowlawn. Ms. Zook held this position during the time of the events described in this Complaint.

**ANSWER:**   Defendants have no knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 10 and neither admit nor deny the allegations but demand strict proof thereof.

11.   Defendant White County is a municipal corporation under the laws of the State of Indiana. Ind. Code § 36–1–2–23. The County's place of business is 110 North Main Street, Monticello, Indiana 47960. At all relevant times, Defendant White County was acting under the color of state law.

**ANSWER:**   Defendant denies White County is a municipal corporation but admits it is a civil division of the state of Indiana with administrative offices in Monticello. Remaining allegations contained in paragraph 11 are denied.

12.   Defendant White County Sheriff's Department ("WCSD") is a law enforcement agency located within White County, Indiana. The Department's place of business is 915 West Hanawalt Road, Monticello, Indiana 47690. At all relevant times, Defendant WCSD was acting under the color of state law.

**ANSWER:**   Defendants admit the White County Sheriff's Department is an agency of the White County Sheriff located in White County, and that the sheriff's department is located at 915 W. Hanawalt Road in Monticello. Defendants deny the sheriff's department is a suable entity. Remaining allegations contained in paragraph 12 are denied.

13.     Defendant White County and/or Defendant WCSD[1] employ all officials, officers, and members of the WCSD, including the individual defendants named in this Complaint. White County and/or the WCSD are responsible for the supervision, training, official policies, customs, and practices of all WCSD employees.

**ANSWER:**   Defendants admit the White County Sheriff employs defendants Roth, Morrow, Glover and Helms as deputies and that defendant Brooks is the duly elected Sheriff of White County. Defendants admit the White County Sheriff possesses all duties imposed by law. Remaining allegations and characterizations contained in paragraph 13 are denied.

14.     Defendant Bill Brooks, named in his individual and official capacity, is now and was on January 4, 2019 the Sheriff of White County, Indiana. As such, he operates as a final policymaker for Defendant White County and/or Defendant WCSD. In that capacity, he establishes policies, procedures, customs and practices regarding the conduct of the law enforcement officers named below. Defendant Brooks is responsible for the training and supervision of all employees employed in the WCSD. At all relevant times, Defendant Brooks was acting under the color of state law.

**ANSWER:**   Defendants admit Bill Brooks is and was on January 4, 2019 the Sheriff of White County, and admit all duties imposed by law. Defendants admit Sheriff Brooks is the final policymaker for the Sheriff of White County under Indiana law. Remaining allegations contained in paragraph 14 are denied.

15.     Defendant Patrick Shafer, named in his individual and official capacity, is Brooks' predecessor as Sheriff of White County. Defendant Shafer held the position of Sheriff until January 1, 2019, when he retired. When Sheriff of White County, Defendant Shafer operated as a final policymaker for Defendant White County and/or Defendant WCSD. In that capacity, he

---

[1] Both White County and WCSD are named as municipal defendants here because the decisional law of this state is in conflict. Courts have reached opposite conclusions as to whether federal Section 1983 claims and supplemental state law claims are properly pled against a county or a sheriff's department. *See Hamman v. Starke County,* No. 3:18-CV-952-PPS-MGG, 2019 WL 1438294, at *2 (N.D. Ind. April 1, 2019) (discussing conflicting cases).

established policies, procedures, customs and practices regarding the conduct of the law enforcement officers named below. When Sheriff of White County, Defendant Shafer was responsible for the training and supervision of all employees employed in the WCSD. At all relevant times, Defendant Shafer was acting under the color of state law.

**ANSWER:**   Defendants admit Patrick Shafer was the Sheriff of White County until December 31, 2018 and that Sheriff Shafer preceded Sheriff Brooks in office as the Sheriff of White County.  Defendants further admit all duties  imposed by law. Remaining allegations and characterizations contained in paragraph 15 are denied.

16.     Defendant David Roth was at all relevant times employed by White County and/or the WCSD as the Chief Sheriff's Deputy.

**ANSWER:**   Defendants admit chief deputy Roth became chief deputy on January 1, 2019.  Defendants deny chief deputy Roth is or was employed by White County but admit he is a merit deputy employed by the White County Sheriff. Remaining allegations contained in paragraph 16 are denied.

17.     Defendant Evan Morrow was at all relevant times employed by White County and/or the WCSD as a Deputy Sheriff.

**ANSWER:**    Defendants admit  deputy Morrow is and was a merit deputy with the White County Sheriff.  Remaining allegations are denied.

18.     Defendant Ryan Glover was at all relevant times employed by White County and/or the WCSD as a Community Service Officer.

**ANSWER:**   Defendants admit deputy Glover is and was a special deputy with the White County Sheriff.  Remaining allegations are contained in paragraph 18 are denied.

19.     Defendant Mark Helms was at all relevant times employed by White County and/or the WCSD as a Deputy Sheriff. During this time, Defendant Helms was assigned to Meadowlawn as its School Resource Officer.

**ANSWER:**    Defendants admit deputy Helms is and was a merit deputy employed by the White County Sheriff.  Defendants deny deputy Helms was assigned to Meadowlawn Elementary

School as a school resource officer but admit he served the school corporation in that capacity, at school corporation expense.  Remaining allegations and characterizations contained in paragraph 19 are denied.

20.     Defendants Roth, Morrow, Glover, and Helms are employees of White County and/or the WCSD and named in their individual and official capacities. At all relevant times Defendants Roth, Morrow, Glover, and Helms were acting under the color of state law and pursuant to an official policy of White County and/or the WCSD.

**ANSWER:**     Defendants admit deputies Roth, Morrow and Helms serve as merit deputies and that deputy Glover serves as a special deputy for the White County Sheriff.  Remaining allegations contained in paragraph 20 are denied.

## VENUE AND JURISDICTION

21.     This action arises under the Constitution and the laws of the United States and the State of Indiana and is authorized pursuant to 42 U.S.C § 1983 and the common law of the State of Indiana.

**ANSWER:**     Defendants deny this action is authorized to proceed as a claim under 42 U.S.C. § 1983 and therefore deny the allegations contained in paragraph 21.

22.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and § 1367. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

**ANSWER:**     Defendants deny this action is authorized to proceed pursuant to 42 U.S.C. § 1983 and therefore deny the court should exercise jurisdiction over these claims.

23.     Venue is proper in the United States District Court for the Northern District of Indiana pursuant to 28 U.S.C § 1391(b)(2) because all events giving rise to the claim occurred in White County, Indiana.

**ANSWER:**   Defendant admits the allegations contained in paragraph 23 but deny that plaintiffs' claims are authorized to proceed pursuant to 42 U.S.C. § 1983.

## STATEMENT OF FACTS

24.    On January 4, 2019, a group of female teachers including Plaintiffs arrived at Meadowlawn Elementary School for a professional development day. Plaintiffs had only been informed that they would be participating in an "ALICE active-shooter training" and that some teachers had been assigned to a morning session and others to an afternoon session. Plaintiffs were not informed the training would involve any physical force, verbal abuse, threats, or personal injury.

**ANSWER:**   Defendants admit that on January 4, 2019 a group of teachers, female and one male, arrived at the elementary school for ALICE training and that there was a morning and afternoon session.  Remaining allegations are denied.

25.    On the day of the Meadowlawn training, Defendants Roth, Morrow, Glover, and Helms (collectively, "Officers"), acting within their scope of employment and their official duties as employees in the WCSD, clothed with the power of state law, wearing apparel identifying them as WCSD law enforcement officers, and some armed with their active service weapons, conducted the training.

**ANSWER:**   Defendants admit the deputies were on duty and that deputy Roth carried his duty weapon while at the school.  Remaining allegations contained in paragraph 25 are denied.

26.    The White County Sheriff's Department had been conducting this type of active-shooter training in White County workplaces, including schools, for several years at the time of the Meadowlawn training. On information and belief, WCSD officers received training from the ALICE Training Institute, which allowed them to become certified ALICE instructors. ALICE ("Alert, Lockdown, Inform, Counter, Evacuate") is a form of training for responding to critical

incidents such as an active shooter.[2] White County Sheriff's Department has consistently maintained that the trainings they conduct are official ALICE trainings, despite the fact that, upon information and belief, official ALICE trainings do not call for shooting airsoft bullets at non-law-enforcement participants, nor ever using force on participants without first obtaining their consent.

**ANSWER:** Defendants deny the White County Sheriff's Department had been conducting ALICE training at workplaces or schools for several years but admit ALICE training had been coordinated through the Monticello Police Department with participation by sheriff's deputies. Defendants admit deputies Roth and Helms received training and certification from the ALICE Training Institute which allowed them to become instructors, and that ALICE is a form of training for responding to critical incidents such as active shooters. Remaining allegations in paragraph 26 are denied.

27. On information and belief, the prior trainings were carried out in the same or a similar manner as the Meadowlawn training. Sheriff Brooks has publicly stated that the exercises carried out in the Meadowlawn training were exactly the same as those in prior active-shooter trainings given by WCSD.[3]

**ANSWER:** Defendants admit the training was carried out in a similar manner as prior trainings overseen by the Monticello Police Department. Remaining allegations are denied.

28. Among other similarities, prior trainings included the use of loaded airsoft guns. Airsoft guns are projectile weapons designed to resemble actual firearms.[4] They fire plastic bullets at hundreds of feet per second. Used in military and law enforcement training, they require protective gear for safe use because they are capable of inflicting serious physical harm. Versions that fire bullets at more than 400 feet-per-second require a shooting distance of at least 100 feet. Even airsoft guns firing at lower speeds require an absolute minimum of a ten-foot shooting distance.

---

[2] *See* https://en.wikipedia.org/wiki/Active_shooter_training (defining ALICE training).

[3] *See* https://time.com/5556979/indiana-teachers-shot-execution-style-training/ (including Brooks statement).

[4] *See* https://injury.findlaw.com/product-liability/airsoft-guns.html (defining airsoft guns).

**ANSWER:**    Defendants admit prior trainings included the use of Airsoft guns which resemble firearms.  As for remaining allegations contained in paragraph 28, defendants have no knowledge sufficient to form a belief as to the truth of those allegations and demand strict proof thereof.

29.    During the Meadowlawn training, Officers consistently fired at Plaintiffs from less than ten feet away.

**ANSWER:**    Defendants  deny the allegations contained in paragraph 29.

30.    Plaintiffs signed no waiver before participating, nor did they offer any explicit or implicit consent to any component of the training. Plaintiffs had only added their names to a list circulated at a staff meeting, generally indicating their interest in an active-shooter training. Some had subsequently confirmed their participation via e-mail. Plaintiffs wanted to participate because they believed such a training could help them protect their students.

**ANSWER:**    Defendants  deny plaintiffs did not consent to the training, be it explicitly or implicitly.  As to remaining allegations contained in paragraph 30 defendants have no knowledge sufficient to form a belief as to the truth of those allegations and neither admit nor deny the allegations but demand strict proof thereof.

31.    On information and belief, Plaintiffs allege the Meadowlawn training was planned and implemented by Defendant Shafer and Defendant Brooks, as White County and/or WCSD officials with final policy-making authority.

**ANSWER:**    Defendants  deny the allegations contained in paragraph 31.

32.    On information and belief, Plaintiffs allege that Defendant Shafer, Defendant Brooks and the Officers engaged in a planning process for the Meadowlawn training and had conducted similar trainings in the past. Defendants Shafer, Brooks, and the Officers had advance knowledge of what would occur during the Meadowlawn training.

**ANSWER:**    Defendants  admit deputies Roth and Helms had advance knowledge of what would occur during the training at Meadowlawn Elementary School.  Remaining allegations contained in paragraph 32 are denied.

33.    On information and belief, Plaintiffs allege that Officers' conduct during the training occurred within Defendant Shafer's and Defendant Brooks' actual or constructive knowledge and explicit and/or tacit authorization.

**ANSWER:**    Defendants  deny the allegations contained in paragraph 33.

34.    On information and belief, Plaintiffs allege that Sheriff Brooks was present for part of the Meadowlawn training. Defendant Brooks has publicly stated that to be the case.[5]

**ANSWER:**    Defendants  deny the allegations contained in paragraph 34.

## THE MORNING SESSION

35.    The morning session of the training began with participants, approximately fifteen female teachers, including Plaintiffs Franks, Slade, Baltes, and Pinkerton, and the four male Officers, gathering in a classroom. The Officers introduced themselves as police officers and said they would be conducting an "ALICE training," but they did not provide any additional details of what the training would consist of, give any indication that physical force would be used, or attempt to solicit any kind of consent. The introduction did not include any prepared presentation or training materials.

**ANSWER:**    Defendants  admit the morning session  involved female teachers and four merit deputies in a classroom and that no written material was distributed.  Remaining allegations and characterizations contained in paragraph 35 are denied.

---

[5] *See* https://www.indystar.com/story/news/politics/2019/03/21/active-shooter-training-for-schools-teachers-shot-with-plastic-pellets/3231103002/ (including Brooks statement).

## THE EXECUTION STYLE DRILL

36.     After the brief introduction, the Officers directed the teachers to break into small groups of four or five to perform the first drill in turn. Ms. Franks was in the first group to participate.

**ANSWER:**   Defendants admit the teachers  broke into small groups to perform the first drill.  Defendants have no knowledge as to whether plaintiff Franks was in the first group and demand strict proof thereof.  Remaining allegations or characterizations contained in paragraph 36 are denied.

37.     Defendants Helms and Glover escorted the first small group to a different classroom. The Officers did not provide any further information about what the teachers were about to experience, either to this or any subsequent group. These and subsequent participants were handed protective goggles as they entered the room, but were provided no other safety equipment, nor any explanation as to why goggles were necessary.

**ANSWER:**   Defendants admit the group went to a different classroom with deputies Helms and Glover and were provided face coverings prior to entering the room.  Remaining allegations and characterizations contained in paragraph 37 are denied.

38.     Defendants Morrow and Roth, who stayed behind with the remaining teachers, had full knowledge of what this first group, and each subsequent group, was to endure in this exercise (the "Execution Style Drill.")

**ANSWER:**   Defendants deny the allegations contained in paragraph 38.

39.     The first small group entered a classroom that was dark. Defendants Helms and Glover did not turn on the lights, instead directing the teachers to line up along the wall opposite the door and get down on their knees facing the wall. Teachers' location in the room gave them no

clear path to the exit except through the Defendants. Each Plaintiff in this and subsequent groups was restricted in their movement during this drill, even before being shot.

**ANSWER:**   Defendants admit the group lined up against a wall and were on their knees. Remaining allegations contained in paragraph 39 are denied.

40.     While teachers complied with instructions to line up and kneel down, one of the Officers, believed to be Defendant Helms, told teachers, "this is what happens if you just cower and do nothing" in response to an active shooter.

**ANSWER:**   Defendants admit deputy Helms gave an admonition along the lines described in paragraph 40.

41.     Only seconds after kneeling, teachers were shot without warning by one of the Officers, believed to be Defendant Glover, with an airsoft gun. The Officer shot teachers from point-blank range, walking back and forth along the line of kneeling teachers until his gun ran out of bullets.

**ANSWER:**   Defendants deny the allegations contained in paragraph 41.

42.     Upon being shot, teachers immediately felt intense pain. The bullets broke skin and left teachers bleeding. Ms. Franks, shot at least twice in the back, felt a burning and stinging sensation with each shot. Both shots broke her skin, leaving welts that would take days to heal.

**ANSWER:**   Defendants deny the allegations contained in paragraph 42.

43.     Some teachers immediately yelled "ouch," while others cried out unintelligibly in pain. All teachers' body language showed clear signs of physical distress as they squirmed to avoid the bullets. For each Plaintiff, the Execution Style Drill was one of the most terrifying experiences of her life. Immobilized by fear and the physical force of the bullets pinning them down,

participants could not turn around. Doing so would have exposed them to shots in the face and shots at even closer range. For the same reasons, escape was foreclosed for Plaintiffs each time the Execution Style Drill was carried out.

**ANSWER:**    Defendants have no knowledge as to whether certain teachers yelled "ouch" and demand strict proof thereof.  Remaining allegations contained in paragraph 43 are denied.

44.    Once the shooting ceased, teachers were instructed to get up and return to the first classroom. They did so in a complete state of shock. Again escorted by the Officers, they were specifically directed to tell their waiting colleagues nothing about what had just occurred, demonstrating that surprise was a conscious and deliberate element of the Execution Style Drill.

**ANSWER:**    Defendants  admit that after the exercise teachers went to a different classroom and  were told to not discuss their experience with  other teachers as part of the ALICE training.  Remaining allegations and characterizations contained in paragraph 44 are denied.

45.    Throughout the day, when Plaintiffs moved from place to place, it was at the direction of Officers. Officers escorted Plaintiffs during each transition and hovered nearby during any short breaks.

**ANSWER**:    Defendants deny the allegations contained in paragraph 45.

46.    The degree of control exercised by the Officers, combined with the state of shock triggered as soon as the Execution Style Drill began for each Plaintiff, made it virtually impossible for Plaintiffs to opt out of the proceedings once they were underway. Plaintiffs did not believe they had the choice to opt out once the training was underway, as they feared punishment from Officers' if they did so.

**ANSWER**:    Defendants deny the allegations contained in paragraph 46.

14

47.     In each iteration of the Execution Style Drill, the Officers were grinning or laughing when the teachers got up from their knees and turned around. Plaintiffs observed the Officers smiling, laughing, joking, and making light of events throughout the day.

**ANSWER**:   Defendants deny the allegations contained in paragraph 47 other than defendant Helms may have been smiling along with the teachers who were also smiling after the drill.

48.     During the first Execution Style Drill, the remaining teachers, including Plaintiffs Baltes, Pinkerton, and Slade, waited with Defendants Roth and Morrow. Although they heard some commotion, the waiting Plaintiffs did not learn what had happened in the Execution Style Drill or begin to suspect they may be subjected to any use of physical force.

**ANSWER**:   Defendants have no knowledge as to whether plaintiffs Baltes, Pinkerton and Slade did not learn of what happened during the drill and demand strict proof thereof. Remaining allegations contained in paragraph 48 are denied.

49.     Defendant Helms next directed the second small group, which included Plaintiff Baltes, to follow him. Ms. Baltes saw that the returning teachers from the first group were upset. However, those teachers complied with the Officers' command and did not disclose anything about the Execution Style Drill. Defendants Morrow and Roth were present and would have heard any disclosures. Both morning and afternoon Plaintiffs feared punishment from the Officers if they disclosed information about the drill. All instructions given by the Officers that day were communicated as law enforcement orders, not the requests or suggestions of professional development trainers.

**ANSWER**:   Defendants admit deputy Helms  oversaw the  drill with a second smaller group.  Defendants have no knowledge as to whether plaintiff Baltes was with this group and demand strict proof thereof.  Remaining allegations contained in paragraph 49 are denied.

50.     Defendants Helms and Glover repeated the Execution Style Drill with the second small group. They once again directed teachers to line up and kneel down facing the wall and then,

without warning, shot them at point-blank range. The shooter, believed to be Defendant Glover, once again walked up and down the line firing on teachers until his gun ran out of bullets. Ms. Baltes was shot three times. The impact of the high-velocity shots broke her skin and left her with a large welt.

**ANSWER**:   Defendants admit deputies Helms and Glover repeated the drill with the second group in the same manner as with the first group which required kneeling and facing the wall while wearing face coverings.  Remaining allegations contained in paragraph 50 are denied.

51.     Teachers again cried out in pain, exclaiming "ouch" and "this really hurts" as they squirmed around in obvious physical pain. When the shooting subsided, Ms. Baltes stood up and glared at Defendants Helms and Glover. She was shocked to find that they were grinning back at her. Once again, Defendants instructed participants to say nothing to the waiting teachers.

**ANSWER**:   Defendants admit deputy Helms told the participants to not discuss  their experience with the next group, as part of ALICE training.  Remaining allegations contained in paragraph 51 are denied.

52.     Defendant Helms returned with the second group and directed the third and final group, which included Plaintiffs Pinkerton and Slade, to follow him. As instructed, no teachers in the first or second groups disclosed what had occurred and the teachers in the third group were unaware of what would take place.

**ANSWER**:   Defendants admit deputy Helms accompanied the third group into the room for the drill.  As to remaining allegations, defendants have no knowledge sufficient to form a belief as to the truth of those allegations and demand strict proof thereof.

53.     Defendant Helms began giving his instructions to line up, stating "this is what happens when you do nothing." Worried, Ms. Slade said "wait." She asked, "so are we sitting ducks?" Defendant Helms responded casually: "yeah, I like that." He repeated the phrase, "sitting ducks."

**ANSWER**:    Defendant Helms admits making the statement "this is what happens when you do nothing" at times during the training sessions. Remaining allegations contained in paragraph 53 are denied.

54.    Just as in the two prior iterations of the Execution Style Drill, teachers complied with Officers' orders and were shot without warning as soon as they got on their knees. The shooter once again walked up and down the line shooting participants one by one until his gun ran out of bullets. Plaintiffs Pinkerton and Slade were each shot multiples times, with bullets breaking their skin and leaving welts, despite the fact that Ms. Slade was wearing three layers of clothing including a jacket. When they rose, some teachers with tears in their eyes, they found the men were laughing at them.

**ANSWER**:    Defendants admit plaintiff Slade was wearing layers of clothing including a jacket.  Remaining allegations contained in paragraph 54 are denied.

55.    Morning participants were allowed a bathroom break once they had all completed the Execution Style Drill. Once in the bathroom, teachers shared their experiences for the first time. They examined one another and found that almost every participant was bleeding and had welts on her back. Out of the earshot of the Officers for the first time, teachers expressed their shock, anger, and physical pain. Several teachers observed that even sitting in a chair was painful.

**ANSWER**:    Defendants deny participants were bleeding or had welts on their back.  As to remaining allegations, defendants have no knowledge sufficient to form a belief as to those allegations and demand strict proof thereof.

56.    During this break and in clear sight of Ms. Franks and other teachers, Defendant Helms shot another officer near his groin area. As the other officer reached down to his groin in pain, Defendant Helms chuckled, saying jokingly, "oh, sorry man, didn't mean to shoot you there."

**ANSWER**:    Defendant admits he used the Airsoft gun against a town marshal who was present at the school but not part of the ALICE training and made a remark to the town marshal along the lines as described 56.  As to remaining allegations contained in paragraph 56 Helms has no knowledge sufficient to form a belief as to the truth or falsity and demands strict proof thereof.

## THE ROTATING DRILLS

57.     Once all the teachers had re-assembled, the Officers announced that next, the teachers would again be split into small groups and rotated through three different drills (the "Rotating Drills"). In each drill, one participant would play the role of the teacher and the other members of the small group would play the roles of students. All small groups engaged in the Rotating Drills simultaneously.

**ANSWER**:    Defendants Roth, Morrow, Glover and Helms admit the allegations contained in paragraph 57.  Defendant Brooks has no knowledge sufficient to form a belief as to the truth of those allegations and demands strict proof thereof.

58.     Defendant Glover played the role of an active shooter. He began each drill by striding quickly down the hallway, loudly banging on walls while screaming furiously, yelling out numerous obscenities and threats, such as "give me back my kid, you bitch," "fuck you, you motherfuckers," and "I'm going to kill you all!" The other Officers rotated teachers from room to room, assigned participants to roles, and gave general directions to participants.

**ANSWER**:    Defendants Roth, Morrow, Glover and Helms admit the allegations contained in paragraph  58.  Defendant Brooks has no knowledge sufficient to form a belief as to the truth of those allegations and demands strict proof thereof.

59.     In one drill, the participant playing the teacher was instructed to run and quickly close the door while those playing students ran to hide behind bookshelves, desks, chairs, or whatever classroom objects they could find (the "Run and Hide Drill"). Defendant Glover then went from classroom to classroom, entering through the unlocked doors and firing at the participants in their hiding spots, with bullets striking the cornered teachers.

**ANSWER**:    Defendants deny all classroom doors were unlocked and deny that deputy Glover fired at participants but admit he  fired one round past them if  able to get into the room. Defendants deny any of the pellets struck the teachers.  Remaining allegations contained in paragraph 59 are admitted.

60.     In another drill, the participant playing the teacher was instructed to run, lock, and barricade the door to prevent Defendant Glover from entering (the "Barricade Drill").  Defendant Glover went from classroom to classroom violently rattling doorknobs and – if possible – throwing open classroom doors and aiming directly at the cornered teachers and shooting them.

**ANSWER**:     Defendants deny deputy Glover aimed directly at teachers or that he shot at teachers.  Remaining allegations contained in paragraph 60 are admitted.

61.     The third drill required participants to throw tennis balls at Officers while they were being fired upon (the "Counter-Assault Drill"). In this exercise, multiple Officers shot at teachers at the same time. Throwing the tennis balls forced the participants to stand up and further expose themselves to being shot. Ms. Pinkerton was shot in her stomach, resulting in a permanent scar. Ms. Franks felt too frightened to rise and throw tennis balls, so she stood frozen in a corner of the room for the entirety of the drill, hoping not to get shot. Ms. Baltes was shot forcefully in the stomach and knew she could not bear to be shot again. She crawled under a table and curled up in the fetal position. An officer, believed to be Defendant Glover, quickly found her, aimed directly at her body, and shot her three times while she was immobile.

**ANSWER**:     Defendants deny officers shot at teachers, that teachers were exposed to being shot, that Pinkerton was shot in the stomach or that she sustained a permanent scar. Defendants admit the drill required participants throw tennis balls at Glover.   Remaining allegations contained in paragraph 61 are denied.

62.     Throughout the Rotating Drills, Officers repeatedly smirked, laughed, and joked, including in moments when teachers were being hit with bullets, crying out in pain, or demonstrating extreme fear.

**ANSWER**:     Defendants deny the allegations contained in paragraph 62.

63.     Upon conclusion of the Rotating Drills, the Officers escorted the teachers into the gymnasium. Defendant Helms delivered no prepared presentation or educational materials, only saying a few brief words before dismissing the teachers. Once released, the teachers again had the opportunity to assess their physical condition. Plaintiffs and other teachers identified areas of bruising, bleeding, welts, and broken skin.

**ANSWER**:   Defendants deny the teachers were escorted into the gymnasium. Defendants admit that teachers followed deputies into the gymnasium as part of a tour of the entire school for safety and security evaluation.  Defendants admit the teachers underwent debriefing at the end of every session but that no written material was handed out.  Remaining allegations and characterizations contained in paragraph 63 are denied.

## THE AFTERNOON SESSION

64.     While the morning session was ongoing, teachers scheduled for the afternoon session worked in their own classrooms in a separate wing of the school building. Those teachers included Plaintiffs Zook, Hare, Snyder, and Paulik.

**ANSWER**:   Defendants admit that while the morning session was ongoing teachers scheduled for the afternoon session were in other parts of the building.  Defendants have no knowledge as to the identity of those teachers and demand strict proof thereof.

65.     The afternoon Plaintiffs did not see or hear anything to indicate that the morning session involved teachers being subjected to physical force in any way, much less being shot repeatedly at close range and injured. Prior to their session, the afternoon Plaintiffs had no contact with morning participants.

**ANSWER**:   Defendants have no knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 65 and neither admit nor deny the allegations but demand strict proof thereof.

66.     The afternoon session began with participants, approximately 20 female teachers, gathering in the school library. The school's principal at the time, Casey Davenport, was also present to observe the afternoon session.  Only three of the four Officers were present at the

afternoon session: Defendants Helms and Glover and a third officer, believed to be Defendant

Roth. As in the morning session, Defendants wore insignia identifying themselves as WCSD

officers and some were armed with service weapons. As before, they introduced themselves as

police officers and characterized the activity as an ALICE training.

> **ANSWER**:    Defendants admit the afternoon session began in the school library and that the school principal was present as well as deputies Helms, Glover and Roth.  Defendants admit deputy Roth carried his duty weapon and the teachers were informed they would undergo ALICE training.  Remaining allegations contained in paragraph 66 are denied.

67.    As in the morning session, the Officers provided no information about what would

occur and gave no indication that any amount of physical force would be used on teachers.

Following a brief introduction, the Officers instructed teachers to break into small groups. All

Plaintiffs who participated in the afternoon session (Zook, Hare, Snyder, and Paulik) were in the

first group to participate.

> **ANSWER**:    Defendants admit the teachers were requested to break into smaller groups. Defendants have no knowledge as to who participated in the afternoon session and demand strict proof thereof.  Remaining allegations contained in paragraph 67 are denied.

## THE EXECUTION STYLE DRILL

68.    Defendant Helms instructed the first group to follow him into a classroom in which

the lights were out and the blinds were drawn. In the afternoon, the Execution Style Drill was

conducted solely by Defendant Helms. Principal Davenport was present as an observer.

> **ANSWER**:    Defendants admit principal Davenport was present as an observer. Remaining allegations contained in paragraph 68 are denied.

69.    Defendant Helms directed the teachers to line up against the wall farthest from the

door and get down on their knees. Defendant Helms positioned himself directly between the

teachers and the doorway. Plaintiff Snyder asked what was about to happen and whether he was

about to shoot them. Defendant Helms did not respond to Ms. Snyder's question, so she repeated it. He then turned to Ms. Snyder and said "shut up" and directed her to "stop asking questions."

**ANSWER**:    Defendants admit the teachers were requested to line up against a wall and get on their knees while wearing face coverings and that deputy Helms positioned himself between them and the doorway.  Remaining allegations are denied.

70.    Defendant Helms began shooting the teachers as soon as they were on their knees. Teachers immediately cried out in pain. A bullet struck Ms. Zook so forcefully that she lost her balance and fell into Ms. Snyder's arms. Plaintiffs Snyder, Zook, and Paulik then hugged each other and curled up on the floor together, trying to shield themselves and each other from the bullets.

**ANSWER**:    Defendants deny the allegations contained in paragraph 70.

71.    In the morning session, Defendant Glover had walked along the line of kneeling teachers shooting each one individually, but now Defendant Helms stood in one position while rapidly shooting back and forth hitting teachers with a constant spray of bullets.

**ANSWER**:    Defendants deny the allegations contained in paragraph 71.

72.    Ms. Zook was shot approximately four times in the back, while Plaintiffs Snyder and Hare were each struck approximately twice. Ms. Paulik, by curling her body under Ms. Zook, was able to avoid getting shot. All shots that made contact with Plaintiffs left welts, with multiple shots breaking the skin, causing bleeding, and leaving bruises.

**ANSWER**:    Defendants deny the allegations contained in paragraph 72.

73.    Once the shooting ceased, Ms. Snyder stood up angrily, glared at Defendant Helms, and demanded to know what had just happened: "Why did you shoot us?" Defendant Helms smiled, laughed, and responded "that's just part of the training." He then instructed teachers to return to the library, be quiet, and to tell no one what had just occurred.

**ANSWER**:    Defendants admit the teachers  were requested to return to the library and to not discuss their experience with  others , as part of the ALICE training.  Remaining allegations contained in paragraph 73 are denied.

74.    Once the afternoon Plaintiffs had returned to the library, they urged other teachers to put on more layers of clothing because they were about to be shot. No Plaintiffs were in the groups that received these warnings. Plaintiffs had to whisper their warnings because at least one Defendant was close by.

**ANSWER**:    Defendants deny the allegations contained in paragraph 74.

75.    While waiting for other groups to complete the Execution Style Drill, teachers talked in hushed voices. Some pulled up their shirts to compare wounds. They expressed shock, anger, and emotional upset.

**ANSWER**:    Defendants deny the allegations contained in paragraph 75.

76.    Once all afternoon participants had completed the Execution Style Drill, they gathered in the library with the three Officers. Ms. Hare and others expected an explanation of the purpose of the drill, but Defendant Helms simply stated that it was "what happens when you do nothing."

**ANSWER**:    Defendants admit the participants returned to the library.  As to remaining allegations defendants have insufficient knowledge by which to admit or deny the allegations and demand strict proof thereof, or deny same.

77.    On information and belief, the Execution Style Drill was conducted in the same manner for all small groups who participated in the afternoon.

**ANSWER**:    Defendants admit the allegations contained in paragraph 77.

<u>THE ROTATING DRILLS</u>

78.    Officers then broke teachers into groups to complete the Rotating Drills. The simulations were structured as in the morning, with Defendant Glover reprising his role as the

23

active shooter. While conducting the simulations, he once again banged on walls, screamed threats, and yelled numerous expletives.

**ANSWER**:     Defendants admit the allegations contained in paragraph 78.

79.     Officers again shot at teachers during each of the Rotating Drills. During one Run and Hide Drill, Defendant Glover shot at teachers who were attempting to hide and hit multiple participants, including Ms. Snyder.

**ANSWER**:     Defendants deny the allegations contained in paragraph 79.

80.     In a Barricade Drill, Ms. Paulik played the role of the teacher. She was unable to lock her door because a trash bag was caught over the lock. When Defendant Glover entered the room, he immediately aimed his gun directly at Ms. Paulik's face, holding it just inches away. While Defendant Glover kept his gun trained at her face, Ms. Paulik was terrified she would imminently be shot in the head. Defendant Glover turned his gun only slightly to aim at other participants and opened fire. Each shot exploded as a loud pop next to Ms. Paulik's ear.

**ANSWER**:     Defendants deny the allegations contained in paragraph 80.

81.     One of the bullets fired by Defendant Glover narrowly avoided hitting Ms. Snyder in the face, while others loudly hit the metal cabinet door she was using to hide. After Defendant Glover exited the room, Ms. Snyder, terrified by what had just occurred, told Ms. Paulik "oh my god, I'm afraid I'd be dead if this were real."

**ANSWER**:     Defendants deny the allegations contained in paragraph 81.

82.     In another iteration of the Barricade Drill, Ms. Snyder played the role of the teacher. She was successful in locking the door before Defendant Glover could enter. A few minutes later, Officers returned to tell Ms. Snyder the simulation was over and that she could unlock her door. Still terrified, Ms. Snyder refused to open the door, stating that there was no way she ever would.

Ms. Snyder believed that if she did, Officers would just shoot her and her colleagues again. After over a minute of Officers repeatedly asking Ms. Snyder to be let in, Ms. Paulik got up and opened the door on Ms. Snyder's behalf.

**ANSWER**:    Defendants deny the allegations contained in paragraph 82.

83.    During one Counter-Assault Drill, Ms. Hare was shot one or two times while Ms. Zook was shot at least once. Both Ms. Snyder and Ms. Paulik were too scared to be shot again, so they gave their tennis balls to other participants and attempted to hide for the entirety of the drill. An officer, believed to be Defendant Glover or Helms, intimidated Ms. Snyder by loudly yelling at her. The officer accused her of breaking the rules and not doing the drill "right." Distressed, Ms. Snyder blurted out "I don't care! I don't care! I'm not doing it the way you want" because she could not bear to be assaulted again.

**ANSWER**:    Defendants deny the allegations contained in paragraph  83.

84.    In the afternoon session, as in the morning session, Plaintiffs witnessed Defendants laughing on multiple occasions, usually when teachers were either being hit with bullets, crying out in pain, or demonstrating fear.

**ANSWER**:    Defendants deny the allegations contained in paragraph 84.

85.    After the Rotating Drills had ended, all afternoon participants, in a haze of shock due to what they had endured, were escorted back into the library. Defendant Helms said a few brief words before stating that the training was over and the teachers were dismissed. Afternoon participants received no training materials or prepared presentations at any time.

**ANSWER**:    Defendants admit teachers returned to the library and that they were not supplied written material.  Remaining allegations contained in paragraph 85 are denied.

86.     All participants, including Plaintiffs, complied with the Officers' instructions throughout the entirety of the Meadowlawn training and at no time during either the morning or afternoon sessions did any participant pose a threat to the Officers' safety or interfere with the Officers' duties in a way that would require any of the Officers to use force.

**ANSWER**:     Defendants deny they used force against the teachers.  Defendants admit the teachers did not pose a threat to officer safety or interfere with duties but deny that they were exercising police powers such that officer safety or law enforcement  duties were at issue during the ALICE training.  Remaining allegations contained in paragraph 86 are denied.

87.     At no time during the Meadowlawn training did any Officer attempt to intervene into another's actions or tell the other Officers to stop shooting teachers or change their actions in any way, despite ample opportunity to do so.

**ANSWER**:     Defendants deny any police action was being undertaken in connection with the ALICE training and that hence there was no need to intervene for any reason.

<u>PLAINTIFFS' INJURIES</u>

88.     As a direct and proximate result of Defendants' actions, Plaintiffs experienced significant physical pain throughout the training. Plaintiffs suffered physical injuries, including bruising, bleeding, welts, and broken skin.

**ANSWER**:     Defendants deny the allegations contained in paragraph 88.

89.     As a direct and proximate result of Defendants' actions, Plaintiffs continued to feel physical pain and discomfort long after the training was over. A shot taken at close range during the Counter-Assault Drill left Ms. Pinkerton with a permanent scar. Ms. Slade had multiple bruises that caused severe pain and forced her to change the way she slept for over a month. Plaintiffs Zook and Franks had bruises and cuts that took days to heal. Plaintiffs Snyder, Hare, Baltes, and Pinkerton had bruises and cuts that took weeks to heal.

**ANSWER**:     Defendants deny the allegations contained in paragraph 89.

90.     As a direct and proximate result of Defendants' actions, Plaintiffs Franks and Pinkerton each used over-the-counter pain medication to treat the injuries caused by Defendants, which they paid for with personal funds.

**ANSWER**:     Defendants deny the allegations contained in paragraph 90.

91.     As a direct and proximate result of Defendants' actions, Ms. Pinkerton was treated by a medical doctor for the injury that resulted in a permanent scar. She contributed personal funds to pay for this treatment.

**ANSWER**:     Defendants deny the allegations contained in paragraph 91.

92.     As a direct and proximate result of Defendants' actions, Plaintiffs experienced severe emotional distress throughout the training, including extreme states of fear, anxiety, and the humiliation of having Officers joke, laugh, and smirk at their fear and physical pain.

**ANSWER**:     Defendants deny the allegations contained in paragraph 92.

93.     Each of the Plaintiffs held law enforcement officers in positive regard prior to the training and trusted them to be professional and helpful. Several have close relationships with law enforcement officers. Ms. Pinkerton's husband, Ms. Baltes' brother-in-law, and Ms. Franks' daughter-in-law all serve in law enforcement.

**ANSWER**:     Defendants have no knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 93 and neither nor deny the allegations but demand strict proof thereof.

94.     As a direct and proximate result of Defendants' actions, Plaintiffs continued to experience severe emotional distress long after the training was over. Ms. Snyder was emotionally changed as a teacher and now experiences elevated levels of fear and anxiety while doing her job. After the training, Ms. Pinkerton experienced bursts of anger against people close to her and struggled to focus on basic tasks at home.  Previously an open and trusting person, Ms. Franks'

trust in others was deeply violated by Defendants' actions. Given that the Defendants administering the attacks were in law enforcement – the occupation she had viewed as the most trustworthy in society – she now believes there is no one she can trust. The Meadowlawn training has negatively impacted the relationships in her life. All of Plaintiffs' varying forms of emotional distress continue to the present day.

      **ANSWER**:    Defendants deny the allegations contained in paragraph 94.

95.    As a direct and proximate result of Defendants' actions, Plaintiffs Hare and Pinkerton were treated by psychiatric professionals. Both Plaintiffs contributed personal funds to the cost of their psychological treatment.

      **ANSWER**:    Defendants deny the allegations contained in paragraph 95.

96.    As a direct and proximate result of Defendants' actions, Ms. Pinkerton was diagnosed with Post-Traumatic Stress Disorder ("PTSD")[6] and continues to take prescription medication to the present day. She contributes personal funds to the cost of the prescription medication.

      **ANSWER**:    Defendants deny the allegations contained in paragraph 96.

97.    As a direct and proximate result of Defendants' actions, Plaintiffs experience increased anxiety and fear when they are around the Officers who conducted the training. Ms. Pinkerton is anxious and uncomfortable around Officer Helms, the School Resource Officer for Meadowlawn Elementary. Ms. Slade also reports being terrified of Officer Helms and has even learned how to record conversations on her cell phone because she fears he will barge into her classroom and verbally berate her. Ms. Snyder is terrified of Officer Glover, going out of her way to avoid him around town. She has frequent flashbacks to the threatening expletives he screamed

---

[6] *See* https://www.nimh.nih.gov/health/topics/post-traumatic-stress-disorder-ptsd/index.shtml (defining PTSD).

at teachers during the Rotating Drills. Each of the Plaintiffs' fear of the Officers continues to the present day.

**ANSWER**:     Defendants deny the allegations contained in paragraph 97.

98.     As a direct and proximate result of the Defendants' actions, Plaintiffs Hare and Slade experience increased anxiety and fear around all law enforcement officers. Plaintiff Hare is scared when she sees police officers in public and is uncomfortable in their presence, often having to leave places where there is any police presence, even in casual settings like a restaurant. Prior to the training, Plaintiff Slade had complete faith and trust in law enforcement, but that was destroyed by Officers' actions. Plaintiffs Hare and Slade's fear of law enforcement continues to the present day.

**ANSWER**:     Defendants deny the allegations contained in paragraph 98.

99.     As a direct and proximate result of Defendants' actions, Plaintiffs Pinkerton, Baltes, Snyder, Zook, and Paulik experience heightened anxiety during school lockdown drills that are required for their employment. In the fall of the following school year, Meadowlawn Elementary conducted an unannounced lockdown drill that terrified them. During that drill, Ms. Snyder was brought back to the January 2019 training and was terrified an intruder was coming to kill her. Her fear manifested in physical symptoms like shaking. She was panicking and experiencing far more anxiety than in similar drills in the past. Ms. Baltes was terrified that the drill was real and feared she could not protect her students. She kept thinking back to the training, which increased her fear and anxiety. As her fear rose, she texted another teacher to tell her she believed this was not a drill but was instead the "real deal." Plaintiff Baltes felt less prepared to protect her students and address a potential threat than she had in similar lockdown drills prior to the January 2019 training.

**ANSWER**:     Defendants deny the allegations contained in paragraph 99.

100.    As a direct and proximate result of Defendants' actions, Plaintiffs Franks and Baltes experience increased fear and anxiety around firearms. Ms. Baltes had always been comfortable around firearms and would often go hunting or to the gun range for recreation. She has been unable to engage in either activity since the training, which caused her to lose the confidence and comfort she once felt around firearms.  Ms. Franks had long been scared of firearms, but in the years leading up to the training had made tremendous strides in overcoming her fear, to the point where she was able to go to the gun range annually with family members. After the training, Ms. Franks reverted back to a point where she is more afraid of firearms than ever before. Following the training, she made one attempt to return to the gun range with her family, but as soon as she picked up a gun, she immediately put it back down, too scared to even hold it.

**ANSWER**:    Defendants deny the allegations contained in paragraph 100.

101.    It was not unusual for violence to erupt in Plaintiff Slade's self-contained classroom for students with diagnosed emotional disorders. Prior to the training, she often called the WCSD to send officers to protect her from physical harm. However, as a direct and proximate result of the Defendants' actions, Ms. Slade no longer trusted WCSD officers to assist her or conduct themselves professionally. As this lack of officer assistance left her vulnerable to potential violence, Ms. Slade decided she could no longer continue in her position at Meadowlawn and that she would leave at the end of the school year. Ms. Slade began taking interviews for positions with different school districts. Subsequent to her decision to leave, the district re-organized school staffing, which resulted in Ms. Slade's transfer from Meadowlawn.

**ANSWER**:    Defendants have no knowledge as to whether plaintiff Slade's classroom would erupt in violence requiring she call the sheriff's department to protect her from physical harm and demand strict proof thereof.  Remaining allegations contained in paragraph 101 are denied.

102.    As a direct and proximate result of Defendants' actions, Ms. Franks, who taught for 27 years, retired several years earlier than planned. That loss of pension credit years has resulted in diminished retirement benefits.

**ANSWER**:    Defendants deny the allegations contained in paragraph 102.

103.    As a direct and proximate result of Defendants' actions, Ms. Hare resigned from her employment at Meadowlawn and found a job in a new school district after the 2018-2019 school year.

**ANSWER**:    Defendants deny the allegations contained in paragraph 103.

### THE ROLE OF DEFENDANTS WHITE COUNTY AND WCSD

104.    White County and/or the WCSD, implicitly and/or explicitly, adopted and implemented the unconstitutional official policy, custom, and/or practice of conducting what WCSD employees refer to as "ALICE drills" in a way that violates participants' constitutional rights.

**ANSWER**:    Defendants deny the allegations contained in paragraph 104.

105.    The official policy of White County and/or WCSD of conducting ALICE trainings in the unconstitutional manner described herein directly and proximately caused the violation of Plaintiffs' constitutionally protected rights and all additional resulting injuries described herein.

**ANSWER**:    Defendants deny the allegations contained in paragraph 105.

106.    The injuries suffered by Plaintiffs were also a direct and proximate result of White County and/or WCSD, and Defendants Shafer and Brooks' failure to properly train WCSD officers.

**ANSWER**:    Defendants deny the allegations contained in paragraph 106.

107.    By failing to properly train WCSD Officers on how to safely conduct an active-shooter training compliant with participants' constitutional rights, White County and/or WCSD, and Defendants Shafer and Brooks demonstrated deliberate indifference to the constitutional rights of Plaintiffs.

**ANSWER**:    Defendants deny the allegations contained in paragraph 107.

108.    The multiple active-shooter trainings conducted by the White County Sheriff's Department over the course of multiple years constituted a repeated pattern of constitutional violations. Municipal policymakers, including Defendants Shafer and Brooks, had or should have had direct knowledge of these continuing violations, making the need for adequate training of officers plainly obvious.

**ANSWER**:    Defendants deny the allegations contained in paragraph 108.

109.    The inadequacy of officers' training and the likelihood of it resulting in constitutional violations was patently obvious.  Municipal policymakers, including Defendants Shafer and Brooks, knew or should have known that the lack of adequate training and supervision provided to officers was reckless, unnecessarily dangerous, and/or done with calculated and deliberate indifference to the rights of training participants, including Plaintiffs, with whom officers would inevitably come into contact during the course of their duties.

**ANSWER**:    Defendants deny the allegations contained in paragraph 109.

110.    White County and/or WCSD, and Defendants Shafer and Brooks directly and proximately caused the violation of Plaintiffs' constitutionally protected rights and all resulting injuries described herein by failing to properly train and/or supervise WCSD Officers.

**ANSWER**:    Defendants deny the allegations contained in paragraph 110.

## CLAIMS FOR RELIEF

### COUNT I - 42 USC § 1983 Fourth Amendment Violation –

### Unreasonable Seizure

### (Against all Defendants for Execution Style Drills)

111.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

**ANSWER**:    Defendants adopt and reallege their answers to paragraphs 1 through 110 as their answer to paragraph 111 as though fully set forth herein.

112.    While conducting the entirety of the active-shooter training at Meadowlawn Elementary School on January 4, 2019, all Defendants were acting under the color of state law in their actions and inactions.

**ANSWER**:    Defendants deny the allegations contained in paragraph 112.

113.    Officers were acting within their official duties as WCSD employees, and were dressed in uniform and/or other apparel identifying them as employees of the WCSD and verbally identified themselves as employees of the WCSD.

**ANSWER**:    Defendants admit deputies Roth, Morrow, Glover and Helms were on duty during the ALICE training.  Remaining allegations contained in paragraph 113 are denied.

114.    Officers' conduct during the entirety of the Meadowlawn training was performed pursuant to a formal municipal policy of White County and/or the WCSD, or alternatively, a custom or practice of White County and/or the WCSD that is so entrenched that it amounts to an informal policy. Said policy directly and proximately caused the violation of Plaintiffs' constitutionally protected rights and all additional resulting injuries described herein.

**ANSWER**:    Defendants deny the allegations contained in paragraph 114.

115.    Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Brooks and Shafer, who in the role of White County Sheriff, were final policymakers for White County and/or the WCSD.

**ANSWER**:    Defendants admit Sheriff Brooks knew the ALICE training would occur on January 4, 2019.  Defendants deny former Sheriff Shafer knew the ALICE training would occur on January 4, 2019.  Remaining allegations contained in paragraph 115 are denied.

116.    Officers' conduct was the direct and proximate result of the failure by Defendants Brooks and Shafer and Defendants White County and/or the WCSD to properly train WCSD officers.

**ANSWER**:    Defendants deny the allegations contained in paragraph 116.

117.    Defendant Shafer, Defendant Brooks, and Defendant Officers engaged in a planning process for the Meadowlawn training, acting in concert to deprive Plaintiffs of their constitutional rights. Thus, they are each jointly liable for all of Plaintiffs' resulting injuries.

**ANSWER**:    Defendants deny the allegations contained in paragraph 117.

118.    Defendant Shafer, Defendant Brooks, and Defendant Officers had direct knowledge of what would occur during the Meadowlawn training and each had a realistic opportunity, and yet failed, to intervene and prevent the unconstitutional conduct of other Defendants at any point before or during the Meadowlawn training.

**ANSWER**:    Defendants deny any unconstitutional conduct took place and deny plaintiffs' claims are  subject to or authorized by 42 U.S.C § 1983, and otherwise  deny the allegations contained in paragraph 118.

119.    Defendants intentionally limited Plaintiffs' freedom of movement when they led Plaintiffs into a separate classroom, gave them verbal instructions to line up and kneel down facing the wall, and then positioned themselves between Plaintiffs and the sole exit of the classroom. Defendants then further limited Plaintiffs' freedom of movement when they exerted physical force

upon Plaintiffs by shooting at and striking them repeatedly with high-velocity plastic bullets at close range.

**ANSWER**:     Defendants deny the allegations contained in paragraph 119.

120.     As a direct result of Defendants' commands and the physical force of being shot at and hit with bullets, Plaintiffs' freedom of movement was meaningfully restricted and a reasonable person under the circumstances would have understood they were not free to leave.

**ANSWER**:     Defendants deny the allegations contained in paragraph 120.

121.     Defendants' actions, which included shooting Plaintiffs multiple times at close range without forewarning while Plaintiffs were lined up execution style, were objectively unreasonable in light of the facts and circumstances confronting officers.

**ANSWER**:     Defendants deny the allegations contained in paragraph 121.

122.     Defendants' seizure of Plaintiffs was without any legal justification or privilege on the part of Officers. Plaintiffs posed no threat to Officers, Officers had no probable cause or reasonable suspicion of wrongdoing by Plaintiffs, and no other exigent circumstances existed.

**ANSWER**:     Defendants deny the plaintiffs were subject to seizure within the meaning of the Fourth Amendment or state law and deny they were exercising police powers at the time of the ALICE training, and deny remaining allegations contained in paragraph 122.

123.     Defendants' conduct showed a reckless and callous indifference to Plaintiffs' constitutional rights, as well as a reckless disregard for the safety and welfare of Plaintiffs.

**ANSWER**:     Defendants deny the allegations contained in paragraph 123.

124.     Defendants' seizure of Plaintiffs was unreasonable and in violation of Plaintiffs' clearly established Fourth Amendment rights of which a reasonable officer would know, including that police cannot seize citizens who are not suspected of any wrongdoing without legal

justification, and that the scope of any seizure must be related to the seizure's underlying justification.

**ANSWER**:    Defendants deny the plaintiffs were subject to seizure within the meaning of the Fourth Amendment or state law and  deny all remaining allegations contained in paragraph 124.

### COUNT II - 42 USC § 1983 Fourth Amendment Violation –

### Unreasonable Seizure

### (Against all Defendants for the Rotating Drills)

125.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

**ANSWER**:    Defendants adopt and reallege their answers to paragraphs 1 through 124 as their answer to paragraph 125 as though fully set forth herein.

126.    During the Run and Hide Drill, the Barricade Drill, and the Counter-Assault Drill, Defendants intentionally limited Plaintiffs' freedom of movement by ordering them into rooms and hiding places behind closed and locked doors. Defendants further limited Plaintiffs' freedom of movement by shooting at and striking them with high-velocity plastic bullets from close range.

**ANSWER**:    Defendants deny the allegations contained in paragraph 126.

127.    As a direct result of Defendants' orders and the physical force of being shot at and struck with bullets, Plaintiffs' freedom of movement was meaningfully restricted and a reasonable person under the circumstances would have understood they were not free to leave.

**ANSWER**:    Defendants deny the allegations contained in paragraph 127.

128.    Defendants' actions during the Rotating Drills were objectively unreasonable in light of the facts and circumstances confronting officers.

**ANSWER**:    Defendants deny the allegations contained in paragraph 128.

129.     Defendants' seizure of Plaintiffs during the Rotating Drills was without any legal justification or privilege on the part of Officers. Plaintiffs posed no threat to Officers, Officers had no probable cause or reasonable suspicion of wrongdoing by Plaintiffs, and no other exigent circumstances existed.

**ANSWER**:     Defendants deny the plaintiffs were subject to seizure within the meaning of the Fourth Amendment or state law and therefore deny all allegations contained in paragraph 129.

130.     Defendants' conduct showed a reckless and callous indifference to Plaintiffs' constitutional rights, as well as a reckless disregard for the safety and welfare of Plaintiffs.

**ANSWER**:     Defendants deny the allegations contained in paragraph 130.

131.     Defendants' seizure of Plaintiffs was unreasonable and in violation of Plaintiffs' clearly established Fourth Amendment rights of which a reasonable officer would know, including that police cannot seize citizens who are not suspected of any wrongdoing without legal justification, and that the scope of any seizure must be related to the seizure's underlying justification.

**ANSWER**:     Defendants deny the plaintiffs were subject to seizure within the meaning of the Fourth Amendment or state law and  deny the  allegations contained in paragraph 131.

### COUNT III - 42 USC § 1983 Fourth Amendment Violation –

### Excessive Force

### (Against all Defendants for Execution Style Drills)

132.     Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

**ANSWER**:     Defendants adopt and reallege their answers to paragraphs 1 through 131 as their answer to paragraph 132 as though fully set forth herein.

133.    As outlined above, Defendants conducted a seizure of Plaintiffs' persons when conducting the Execution Style Drill.

**ANSWER**:    Defendants deny the plaintiffs were subject to seizure within the meaning of the Fourth Amendment or state law and  deny the allegations contained in paragraph 133.

134.    Defendants' use of force during the Execution Style Drill, which included shooting Plaintiffs multiple times without forewarning from a distance below the minimal safety requirement for the proper use of airsoft guns, was excessive and objectively unreasonable in light of the facts and circumstances confronting Officers.

**ANSWER**:    Defendants deny the allegations contained in paragraph 134.

135.    At the time of the shooting, Plaintiffs posed no threat of danger to Officers and were not under arrest, armed, or interfering with police duties. Officers made no efforts to mitigate the amount of force used or to obtain consent from Plaintiffs. The amount of force used was significant, resulting in areas of bruising, bleeding, welts, and broken skin.

**ANSWER**:    Defendants deny use of force, deny the exercise of police powers and otherwise deny the allegations contained in paragraph 135.

136.    The severe nature of the physical intrusion that Plaintiffs experienced greatly outweighed the importance of any purported governmental interest in using force. No amount of force is necessary to properly conduct an active-shooter training for non-law-enforcement participants.  The Meadowlawn training, while involving extensive physical force, involved little to no educational content. Officers did little to introduce the training or its purpose before beginning the Execution Style Drill. Officers also offered no explanation for why it was necessary to shoot Plaintiffs without forewarning multiple times at close range in order to teach them what happens when they "do nothing" in response to an active shooter. Any potential justification was

diminished by the fact that Officers repeatedly smirked, laughed, and made jokes in response to Plaintiffs exhibiting signs of pain and fear.

**ANSWER**:    Defendants deny the allegations contained in paragraph 136.

137.    Defendants' conduct showed a reckless and callous indifference to Plaintiffs' constitutional rights, as well as a reckless disregard for the safety and welfare of Plaintiffs.

**ANSWER**:    Defendants deny the allegations contained in paragraph 137.

138.    The amount of force used by officers to effectuate the seizure of Plaintiffs was excessive and in violation of Plaintiffs' clearly established Fourth Amendment rights of which a reasonable officer would know, including that police can only use non-lethal weapons in rare circumstances that require forewarning, and that police should not use any amount of force on individuals who pose no threat to officers and are passive.

**ANSWER**:    Defendants deny plaintiffs were subject to seizure and otherwise deny the allegations contained in paragraph 138.

139.    As a direct and proximate result of the force used by Defendants, Plaintiffs sustained injuries in the form of appreciable pain, bruising, bleeding, welts, and continuing emotional distress.

**ANSWER**:    Defendants deny the allegations contained in paragraph 139.

### COUNT IV - 42 USC § 1983 Fourth Amendment Violation –

### Excessive Force

### (Against all Defendants for the Rotating Drills)

140.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

**ANSWER**:    Defendants adopt and reallege their answers to paragraphs 1 through 139 as their answer to paragraph 140 as though fully set forth herein.

141.    As outlined above, Defendants conducted a seizure of Plaintiffs' persons during the Rotating Drills, which included the Run and Hide Drill, the Barricade Drill, and the Counter-Assault Drill.

**ANSWER**:    Defendants deny the plaintiffs were subject to seizure and otherwise deny the allegations contained in paragraph 141.

142.    Defendants' use of force during the Rotating Drills, which included repeatedly shooting at and striking Plaintiffs with bullets, often from distances below the minimal safety requirement for the proper use of airsoft guns, was excessive and objectively unreasonable in light of the facts and circumstances confronting officers.

**ANSWER**:    Defendants deny use of force and deny  remaining allegations contained in paragraph 142.

143.    At no time during the Rotating Drills did Plaintiffs pose any threat of danger to Officers, nor were they under arrest, armed, or interfering with police duties. Officers made no efforts to mitigate the amount of force used throughout the Rotating Drills. The amount of force used was significant, resulting in areas of bruising, bleeding, welts, broken skin, and one permanent scar.

**ANSWER**:    Defendants deny they were engaged in police powers during the ALICE training and deny the  allegations contained in paragraph 143.

144.    The severe nature of the physical intrusion Plaintiffs experienced greatly outweighed the importance of any purported governmental interest in using force. Defendants offered no justification for why it was necessary to repeatedly shoot Plaintiffs with airsoft guns throughout the Rotating Drills. Any potential justification was diminished by the fact Defendants repeatedly smirked, laughed, and made jokes in response to Plaintiffs exhibiting signs of pain and fear.

**ANSWER**:    Defendants deny the allegations contained in paragraph 144.

145.    Defendants' conduct showed a reckless and callous indifference to Plaintiffs' constitutional rights, as well as a reckless disregard for the safety and welfare of Plaintiffs.

**ANSWER**:    Defendants deny the allegations contained in paragraph 145.

146.    The amount of force used by Officers to effectuate the seizure of Plaintiffs was excessive and in violation of Plaintiffs' clearly established Fourth Amendment rights of which a reasonable officer would know, including that police can only use non-lethal weapons in rare circumstances that require forewarning, and that police should not use any amount of force on individuals who pose no threat to officers and are passive.

**ANSWER**:    Defendants deny plaintiffs were subject to seizure or use of force and deny the allegations contained in paragraph 146.

147.    As a direct and proximate result of the force used by Defendants, Plaintiffs sustained injuries in the form of appreciable pain, bruising, bleeding, welts, scarring and continuing emotional distress.

**ANSWER**:    Defendants deny the allegations contained in paragraph 147.

### COUNT V - 42 USC § 1983 Fourteenth Amendment Violation –
### Substantive Due Process
### (Against all Defendants for the Execution Style Drills)

148.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

**ANSWER**:    Defendants adopt and reallege their answers to paragraphs 1 through 147 as their answer to paragraph 148 as though fully set forth herein.

149.    Plaintiffs have a constitutionally protected liberty interest to be free from arbitrary intrusions on their personal security, bodily integrity, and physical and emotional wellbeing.

**ANSWER**:    Defendants deny any constitutional deprivation took place and deny the allegations contained in paragraph 149.

150.     Defendants deprived Plaintiffs of this protected liberty interest when they shot them multiple times at close range without forewarning or consent during the Execution Style Drill.

**ANSWER**:     Defendants deny the allegations contained in paragraph 150.

151.     This intrusion on Plaintiffs' bodily integrity and physical wellbeing was severe, as it resulted in appreciable physical pain and areas of bruising, bleeding, welts, and broken skin.

**ANSWER**:     Defendants deny the allegations contained in paragraph 151.

152.     The intrusion on Plaintiffs' personal security and emotional wellbeing was also severe. Plaintiffs experienced intense emotional distress, extreme fear and anxiety, and humiliation as a direct result of Defendants' conduct.

**ANSWER**:     Defendants deny the allegations contained in paragraph 152.

153.      Defendants' actions were arbitrary and so outrageous as to shock the conscience. The Meadowlawn training was a pre-planned event that provided Defendants opportunity for forethought. It was not a dangerous situation requiring Defendants to make split-second decisions. Defendants consciously disregarded the potential harm to Plaintiffs in planning and performing the Execution Style Drill.

**ANSWER**:     Defendants deny the allegations contained in paragraph 153.

154.     Defendants demonstrated a conscious disregard of the potential harm they were causing Plaintiffs by shooting Plaintiffs in the manner described above while ignoring Plaintiffs' questions, protestations, and exclamations of pain. Defendants deliberately maximized the element of surprise and increased the physical and emotional harm Plaintiffs experienced when they forbade participants from sharing information. Defendants abused their position of power as police officers to affect a battery on an unarmed group of female elementary school teachers who complied with their orders and posed no threat to them.

**ANSWER**:     Defendants deny the allegations contained in paragraph 154.

155.    Defendants' conduct, outlined in the above Paragraph, also demonstrates that they acted maliciously for the purpose of causing harm to Plaintiffs.

**ANSWER**:     Defendants deny the allegations contained in paragraph 155.

156.    Defendants' conduct showed a reckless and callous indifference to Plaintiffs' constitutional rights, as well as a reckless disregard for the safety and welfare of Plaintiffs.

**ANSWER**:     Defendants deny the allegations contained in paragraph 156.

157.    Defendants' actions deprived Plaintiffs of a protected liberty interest and violated Plaintiffs' clearly established Fourteenth Amendment rights of which a reasonable officer would know, including that public officials may not abuse their positions of power in order to affect a battery.

**ANSWER**:     Defendants deny the allegations contained in paragraph 157.

158.    The deprivation of this liberty interest was the direct and proximate cause of the physical and emotional injuries Plaintiffs experienced.

**ANSWER**:     Defendants deny the allegations contained in paragraph 158

**COUNT VI - 42 USC § 1983 Fourteenth Amendment Violation – Substantive Due Process**

**(Against all Defendants for the Rotating Drills)**

159.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

**ANSWER**:     Defendants adopt and reallege their answers to paragraphs 1 through 158 as their answer to paragraph 159 as though fully set forth herein.

160.    Plaintiffs have a constitutionally protected liberty interest to be free from arbitrary intrusions on their personal security, bodily integrity, and physical and emotional wellbeing.

**ANSWER**:    Defendants deny any constitutional deprivations took place or that a constitutional claim can arise under the circumstances described in the complaint and deny the allegations contained in paragraph 160.

161.    Defendants deprived Plaintiffs of this liberty interest when they continued to shoot at Plaintiffs during the Rotating Drills, often from distances below the minimal safety requirement for the proper use of airsoft guns.

**ANSWER**:    Defendants deny the allegations contained in paragraph 161.

162.    This intrusion on Plaintiffs' bodily integrity and physical wellbeing was severe, as it resulted in appreciable physical pain and areas of bruising, bleeding, welts, broken skin, and scarring.

**ANSWER**:    Defendants deny the allegations contained in paragraph 162.

163.    The intrusion on Plaintiffs' personal security and emotional wellbeing was also severe. Plaintiffs experienced intense emotional distress, extreme fear and anxiety, and humiliation as a direct result of Defendants' conduct.

**ANSWER**:    Defendants deny the allegations contained in paragraph 163.

164.    Defendants' actions were arbitrary and so outrageous as to shock the conscience. The Meadowlawn training was a pre-planned event that provided Defendants opportunity for forethought. It was not a dangerous situation requiring Defendants to make split-second decisions. Defendants consciously disregarded the potential harm to Plaintiffs in planning and performing the Rotating Drills.

**ANSWER**:    Defendants deny the allegations contained in paragraph 164.

165.    Defendants demonstrated a conscious disregard of the potential harm they were causing Plaintiffs by continuing to unnecessarily shoot at Plaintiffs throughout the Rotating Drills while laughing, smirking, and making jokes when Plaintiffs exhibited signs of fear and pain. In

doing so, Defendants abused their position of power as police officers to affect a battery on an unarmed group of female elementary school teachers.

**ANSWER**:     Defendants deny the allegations contained in paragraph 165.

166.    Defendants' conduct demonstrates that they acted maliciously for the purpose of causing harm to Plaintiffs.

**ANSWER**:     Defendants deny the allegations contained in paragraph 166.

167.    Defendants' conduct showed a reckless and callous indifference to Plaintiffs' constitutional rights, as well as a reckless disregard for the safety and welfare of Plaintiffs.

**ANSWER**:     Defendants deny the allegations contained in paragraph 167.

168.    Defendants' actions deprived Plaintiffs of a protected liberty interest and violated Plaintiffs' clearly established Fourteenth Amendment rights of which a reasonable officer would know, including that public officials may not abuse their positions of power in order to affect a battery.

**ANSWER**:     Defendants deny the allegations contained in paragraph 168.

169.    The deprivation of this liberty interest was the direct and proximate cause of the physical and emotional injuries Plaintiffs experienced.

**ANSWER**:     Defendants deny the allegations contained in paragraph 169.

### COUNT VII - Indiana State Law Claims for False Imprisonment

### (Against all Defendants for the Execution Style Drills)

170.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

**ANSWER**:     Defendants adopt and reallege their answers to paragraphs 1 through 169 as their answer to paragraph 170 as though fully set forth herein.

171.   White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

**ANSWER**:   Defendants deny the allegations contained in paragraph 171.

172.   Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

**ANSWER**:   Defendants deny the allegations contained in paragraph 172.

173.   Defendant Shafer, Defendant Brooks, and Defendant Officers engaged in a planning process for the Meadowlawn training, acting in concert to deprive Plaintiffs of their rights under state law. Thus, they are each jointly liable for all of Plaintiffs' resulting injuries.

**ANSWER**:   Defendants deny the allegations contained in paragraph 173.

174.   Officers, acting within their scope of employment and official duties as White County and/or WCSD employees, intentionally limited Plaintiffs' freedom of movement and deprived them of their liberty when they led Plaintiffs into a separate classroom, gave them verbal instructions to line up and kneel down facing the wall, and then positioned themselves between Plaintiffs and the sole exit of the classroom. Officers then further limited Plaintiffs' freedom of movement when they exerted physical force upon Plaintiffs by shooting them multiple times at close range.

**ANSWER**:   Defendants deny the allegations contained in paragraph 174.

175.   As a direct result of Officers' commands and the physical force of being shot at and struck with bullets, Plaintiffs' freedom of movement and personal liberty were severely restricted and a reasonable person under the circumstances would have understood they were not free to leave.

**ANSWER**:   Defendants deny the allegations contained in paragraph 175.

176.     Plaintiffs did not consent, expressly or implicitly, to having their freedom of movement restrained by Defendants in such a manner.

**ANSWER**:     Defendants deny the allegations contained in paragraph 176.

## COUNT VIII - Indiana State Law Claims for False Imprisonment

### (Against all Defendants for the Rotating Drills)

177.     Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

**ANSWER**:     Defendants adopt and reallege their answers to paragraphs 1 through 176 as their answer to paragraph 177 as though fully set forth herein.

178.     White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

**ANSWER**:     Defendants deny the allegations contained in paragraph 178.

179.     Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

**ANSWER**:     Defendants deny the allegations contained in paragraph 179.

180.     During the Run and Hide Drill, the Barricade Drill, and the Counter-Assault Drill, Officers intentionally limited Plaintiffs' freedom of movement by ordering them into rooms and hiding places behind closed and locked doors. Officers further limited Plaintiffs' freedom of movement by shooting at and striking them from close range during these drills.

**ANSWER**:     Defendants deny the allegations contained in paragraph 180.

181.     As a direct result of Officers' orders and the physical force of being shot at and struck with bullets, Plaintiffs' freedom of movement was severely restricted and a reasonable person under the circumstances would have understood they were not free to leave.

**ANSWER**:     Defendants deny the allegations contained in paragraph 181.

182.    Plaintiffs did not consent, expressly or implicitly, to having their freedom of movement restrained by Defendants in such a manner.

**ANSWER**:    Defendants deny the allegations contained in paragraph 182.

### COUNT IX - Indiana State Law Claims for Assault and Battery

### (Against all Defendants for Execution Style Drill)

183.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

**ANSWER**:    Defendants adopt and reallege their answers to paragraphs 1 through 182 as their answer to paragraph 183 as though fully set forth herein.

184.    White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

**ANSWER**:    Defendants deny the allegations contained in paragraph 184.

185.    Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

**ANSWER**:    Defendants deny the allegations contained in paragraph 185.

186.    Officers, acting within their scope of employment and official duties as White County and/or WCSD employees, intended to cause harmful or offensive contact with Plaintiffs and/or to put them in imminent apprehension of such contact when they led them into a dark classroom and directed them to line up on their knees facing the wall. Said harmful contact then directly resulted when Officers shot at and struck Plaintiffs multiple times at close range without Plaintiffs' consent and without any forewarning.

**ANSWER**:    Defendants deny the allegations contained in paragraph 186.

187.    At the time of the shooting, Plaintiffs posed no threat of danger to Officers and were not under arrest, armed, or interfering with police duties.

**ANSWER**:   Defendants deny they were engaged in police action at the time of ALICE training and therefore deny the allegations contained in paragraph 187.

188.   At no time during the Execution Style Drill were Defendants engaged in the enforcement of a law, rule, or regulation.

**ANSWER**:   Defendants deny they were engaged in police action during the ALICE training and deny any contrary implication contained in paragraph 188.

189.   As a direct and proximate result of the assault and battery committed by Defendants, Plaintiffs sustained injuries in the form of appreciable pain, bruising, bleeding and welts and continuing emotional distress.

**ANSWER**:   Defendants deny the allegations contained in paragraph 189.

### COUNT X - Indiana State Law Claims for Assault and Battery

#### (Against all Defendants for the Rotating Drills)

190.   Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

**ANSWER**:   Defendants adopt and reallege their answers to paragraphs 1 through 189 as their answer to paragraph 190 as though fully set forth herein.

191.   White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

**ANSWER**:   Defendants deny the allegations contained in paragraph 191.

192.   Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

**ANSWER**:   Defendants deny the allegations contained in paragraph 192.

193.   Officers intended to cause harmful or offensive contact with Plaintiffs and/or to put them in imminent apprehension of such contact when they ordered Plaintiffs into rooms and hiding places behind closed and locked doors, while Officer Glover came down the hallway yelling

threats and expletives before entering and/or attempting to enter Plaintiffs' classrooms. Said harmful contact directly resulted as Officers continued to shoot at and strike Plaintiffs with bullets during the Rotating Drills. Each time Officers shot at Plaintiffs they intended to make physical contact, and in many cases bullets did make contact and cause significant harm to Plaintiffs.

**ANSWER**:     Defendants deny the allegations contained in paragraph 193.

194.    At no time during the Rotating Drills did Plaintiffs pose any threat of danger to Officers, nor were they under arrest, armed, or interfering with police duties.

**ANSWER**:     Defendants deny the deputies were involved in police action at the time of the ALICE training and therefore deny the allegations contained in paragraph 194.

195.    At no time during the Rotating Drills were Defendants engaged in the enforcement of a law, rule, or regulation.

**ANSWER**:     Defendants deny the deputies were engaged in police action at the time of ALICE training and therefore deny the allegations contained in paragraph 195.

196.    As a direct and proximate result of the assault and battery committed by Defendants, Plaintiffs sustained injuries in the form of intense pain, bruising, bleeding, welts and scarring and continuing emotional distress.

**ANSWER**:     Defendants deny the allegations contained in paragraph 196.

**COUNT XI - Indiana State Law Claims for Intentional Infliction of Emotional Distress**

**(Against all Defendants for the Execution Style Drills)**

197.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

**ANSWER**:     Defendants adopt and reallege their answers to paragraphs 1 through 196 as their answer to paragraph 197 as though fully set forth herein.

198.    White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

**ANSWER**:     Defendants deny the allegations contained in paragraph 198.

199.    Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

**ANSWER**:     Defendants deny the allegations contained in paragraph 199.

200.    Officers, acting within their scope of employment and official duties as White County and/or WCSD employees, acted outrageously and with intent to cause severe emotional distress to Plaintiffs and/or acted in reckless disregard of the probability of causing emotional distress. Defendants' conduct did, in fact, proximately cause Plaintiffs to suffer severe and extreme emotional distress.

**ANSWER**:     Defendants deny the allegations contained in paragraph 200.

201.    Defendants abused their position of power, authority, and trust to maximize the emotional distress experienced by Plaintiffs. Officers intentionally withheld from Plaintiffs the fact that they would be shot at close range and instructed all participants not to tell others about what occurred during the Execution Style Drill.

**ANSWER**:     Defendants deny the allegations contained in paragraph 201.

202.    Officers knew, and any reasonable officer would know, that a group of all-male police officers cornering and shooting directly at female elementary school teachers over the course of several hours would make Plaintiffs susceptible to emotional distress.

**ANSWER**:     Defendants deny the allegations contained in paragraph 202.

203.    Officers knew, and any reasonable officer would know, that leading teachers into a dark room and having them line up execution style, and then proceeding to shoot at and strike them with bullets at close range multiple times without forewarning or consent, would cause severe emotional distress.

**ANSWER**:     Defendants deny the allegations contained in paragraph 203.

204.    Furthermore, Officers were repeatedly and explicitly alerted to Plaintiffs' emotional distress when plaintiffs cried out in pain upon being shot and showed clear physical signs of distress. Officers never adjusted their behavior to mitigate the emotional distress Plaintiffs experienced, but rather heightened Plaintiffs' distress by laughing and making jokes.

**ANSWER**:     Defendants deny the allegations contained in paragraph 204.

205.    Defendants' conduct was well beyond the bounds of socially tolerable conduct, was outrageous, shocks the conscience and exceeds the bounds of decency to such a degree as to be intolerable in a civilized community.

**ANSWER**:     Defendants deny the allegations contained in paragraph 205.

206.    At no time during the Execution Style Drill were Defendants engaged in the enforcement of a law, rule, or regulation.

**ANSWER**:     Defendants deny the  deputies were engaged in police action at the time of ALICE training and therefore deny the allegations contained in paragraph 206.

207.    Defendants' conduct during the Execution Style Drill directly and proximately caused Plaintiffs to experience emotional distress that was serious in nature and of the kind normally aroused in the mind of a reasonable person.

**ANSWER**:     Defendants deny the allegations contained in paragraph 207.

208.    Defendants' conduct immediately caused Plaintiffs to experience intense emotional upset, extreme fear and anxiety, and humiliation.

**ANSWER**:     Defendants deny the allegations contained in paragraph 208.

209.    The emotional distress experienced by Plaintiffs was long-lasting and is still ongoing. Plaintiffs continue to experience serious emotional distress as a direct result of Defendants' conduct.

**ANSWER**:    Defendants deny the allegations contained in paragraph 209.

## COUNT XII - Indiana State Law Claims for Intentional Infliction of Emotional Distress

### (Against all Defendants for the Rotating Drills)

210.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

**ANSWER**:    Defendants adopt and reallege their answers to paragraphs 1 through 209 as their answer to paragraph 210 as though fully set forth herein.

211.    White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

**ANSWER**:    Defendants deny the allegations contained in paragraph 211.

212.    Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

**ANSWER**:    Defendants deny the allegations contained in paragraph 212.

213.    Officers acted outrageously and with intent to cause severe emotional distress to Plaintiffs and/or acted in reckless disregard of the probability of causing emotional distress while conducting the Rotating Drills. Officers' conduct did, in fact, proximately cause Plaintiffs to suffer severe and extreme emotional distress.

**ANSWER**:    Defendants deny the allegations contained in paragraph 213.

214.    Defendants abused their position of power, authority, and trust to maximize the emotional distress experienced by Plaintiffs, including, but not limited to, by unnecessarily shooting at Plaintiffs throughout the Rotating Drills, repeatedly screaming expletives at Plaintiffs, and laughing when Plaintiffs showed signs of fear and pain.

**ANSWER**:    Defendants deny the allegations contained in paragraph 214.

215.    Officers knew, and any reasonable officer would know, that such behavior would cause Plaintiffs to experience severe emotional distress.

**ANSWER**:    Defendants deny the allegations contained in paragraph 215.

216.    Defendants' conduct was well beyond the bounds of socially tolerable conduct, is outrageous, shocks the conscience and exceeds the bounds of decency to such a degree as to be intolerable in a civilized community.

**ANSWER**:    Defendants deny the allegations contained in paragraph 216.

217.    At no time during the Rotating Drills were Defendants engaged in the enforcement of a law, rule, or regulation.

**ANSWER**:    Defendants deny the  deputies were engaged in police action at the time of the ALICE training and therefore deny the allegations contained in paragraph 217.

218.    Defendants' conduct during the Rotating Drills directly and proximately caused, and continues to cause, Plaintiffs to experience emotional distress that is serious in nature and of the kind normally aroused in the mind of a reasonable person.

**ANSWER**:    Defendants deny the allegations contained in paragraph 218.

## COUNT XIII - Indiana State Law Claims for Negligent Infliction of Emotional Distress

### (Against all Defendants for Execution Style Drills)

219.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

**ANSWER**:    Defendants adopt and reallege their answers to paragraphs 1 through 218 as their answer to paragraph 219 as though fully set forth herein.

220.    White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

**ANSWER**:    Defendants deny the allegations contained in paragraph 220.

221.    Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

**ANSWER**:    Defendants deny the allegations contained in paragraph 221.

222.    Officers owe a private duty to refrain from using excessive force in the course of their duties. This duty was violated when Officers assaulted and battered citizens elementary school teachers not suspected of any wrongdoing and who posed no threat to officer safety.

**ANSWER**:    Defendants deny the allegations contained in paragraph 222.

223.    By assaulting and battering Plaintiffs in violation of Indiana law, Officers breached their duty to refrain from using excessive force and Officers' conduct fell below the applicable standard of care necessary to avoid assaulting and battering citizens.

**ANSWER**:    Defendants deny the allegations contained in paragraph 223.

224.    Officers' conduct also fell below the proper standard of care for conducting an active-shooter training. Neither the ALICE Training Model, nor known best practices for active-shooter trainings, call for non-law-enforcement participants to be shot during trainings, nor do they call for participants to ever be shot without their consent. The proper standard of care for conducting active-shooter trainings does not call for teachers to be lined up execution style and then shot multiple times at close range without forewarning. The distance from which Plaintiffs were shot fell below the minimal safety requirements for the proper use of airsoft guns.

**ANSWER**:    Defendants deny the allegations contained in paragraph 224.

225.    At no time during the Execution Style Drill were Defendants engaged in the enforcement of a law, rule, or regulation.

**ANSWER**:    Defendants deny the  deputies were engaged in police action at the time of ALICE training and therefore deny the allegations contained in paragraph 225.

226.    Defendants' breach of their duty to refrain from using excessive force directly and proximately caused, and continues to cause, Plaintiffs to experience emotional distress that is serious in nature and of the kind normally aroused in the mind of a reasonable person.

**ANSWER**:    Defendants deny the allegations contained in paragraph 226.

## COUNT XIV- Indiana State Law Claims for Negligent Infliction of Emotional Distress

### (Against all Defendants for Rotating Drills)

227.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

**ANSWER**:    Defendants adopt and reallege their answers to paragraphs 1 through 226 as their answer to paragraph 227 as though fully set forth herein.

228.    White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

**ANSWER**:    Defendants deny the allegations contained in paragraph 228.

229.    Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

**ANSWER**:    Defendants deny the allegations contained in paragraph 229.

230.    Officers breached their duty to not use excessive force on and batter unarmed citizens, and their conduct fell below all applicable standards of care.

**ANSWER**:    Defendants deny the allegations contained in paragraph 230.

231.    Officers continued to unnecessarily shoot Plaintiffs throughout the Rotating Drills, often at a distance that was below the minimal safety requirement for the proper use of airsoft guns.

**ANSWER**:    Defendants deny the allegations contained in paragraph 231.

232.   At no time during the Rotating Drills were WCSD Officers engaged in the enforcement of a law, rule, or regulation.

**ANSWER:**   Defendants deny the  deputies were engaged in police action during the ALICE training and therefore deny the allegations contained in paragraph 232.

233.   Defendants' breach of their duty to refrain from using excessive force directly and proximately caused, and continues to cause, Plaintiffs to experience emotional distress that is serious in nature and of the kind normally aroused in the mind of a reasonable person.

**ANSWER**:   Defendants deny the allegations contained in paragraph 233.

WHEREFORE, the defendants, White County, White County Sheriff's Department, Bill Brooks, David Roth, Evan Morrow, Ryan Glover and Mark Helms, deny the plaintiffs are entitled to any relief whatsoever as against these defendants.

## AFFIRMATIVE DEFENSES

The defendants, White County, White County Sheriff's Department, Bill Brooks, David Roth, Evan Morrow, Ryan Glover and Mark Helms, for their affirmative defenses to the complaint, state as follows:

1.   The events and circumstances described in the complaint do not give rise to a claim under 42 U.S.C. § 1983; the court therefore lacks subject matter jurisdiction and should dismiss this cause for want of jurisdiction.

2.   Defendants Brooks, Roth, Morrow, Glover and Helms are entitled to qualified immunity on plaintiffs' section 1983 claims as their conduct did not violate a constitutional right of any plaintiff under clearly established law.

3.   The complaint fails to state a claim upon which relief may be granted for violation of a constitutional right subject to redress under 42 U.S.C. § 1983.

4.      The White County Sheriff's Department is not a proper party-defendant and should be dismissed as it is not a suable entity.

5.      White County is not a proper party-defendant as merit deputies serve as agents and servants of a county sheriff, not  a county nor county commissioners.

6.      Plaintiffs' state law claims are barred due to failure to fulfill the notice requirements of the Indiana Tort Claims Act, Ind. Code § 34-13-3-8, 10 and 12.

7.      Plaintiffs' state law claims are barred by any and all applicable immunities contained within the Indiana Tort Claims Act, Ind. Code § 34-13-3-3.

8.      Plaintiffs' claims are barred by waiver and/or consent.

9.      The plaintiffs have failed to mitigate damages.

10.      Defendants are entitled to an award of attorney's fees and costs due to plaintiffs' pursuit of unreasonable and groundless litigation, pursuant to Ind. Code § 34-13-3-21.

WHEREFORE, the defendants, White County, White County Sheriff's Department, Bill Brooks, David Roth, Evan Morrow, Ryan Glover and Mark Helms, pray for judgment in their favor, costs, and all other proper relief.

Respectfully submitted,

STEPHENSON MOROW & SEMLER


_____/s/ James S. Stephenson_____
James S. Stephenson, Atty No. 11434-98
Attorney for Defendants
White County, White County Sheriff's
Department, Bill Brooks, David Roth,
Evan Morrow, Ryan Glover and Mark Helms

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2020, a copy of this document was filed electronically.

Notice of this filing will be sent to the following persons by operation of the court's electronic

filing system.  Parties may access this filing through the court's system.

> Miranda W. Bernadac
> mbernadac@rbelaw.com
> Eric M. Hylton
> ehylton@rbelaw.com
> RILEY BENNETT EGLOFF LLP
> 500 N. Meridian Street, Suite 550
> Indianapolis, IN  46204
>
> Alice O'Brien (*pro hac vice* forthcoming)
> Emma Leheny (*pro hac vice* forthcoming)
> Evan Curdts (*pro hac vice* forthcoming)
> National Education Association
> 1201 16th Street, NW
> Washington, D.C. 20036
> aobrien@nea.org
> eleheny@nea.org
> ecurdts@nea.org
>
>          /s/ James S. Stephenson
> James S. Stephenson

STEPHENSON MOROW & SEMLER
3077 East 98th Street, Suite 240
Indianapolis, IN 46280
Phone:   (317) 844-3830
Fax:        (317) 573-4194
Email:      jstephenson@stephlaw.com

20-7176.bb