UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

| | |
|---|---|
| NICOLE BALTES, JEANNE FRANKS, ABBY HARE, BREANNE PAULIK, TALAINA PINKERTON, DARCY SLADE, DANIELLE SNYDER, and CARRIE ZOOK, | ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Case No. 4:20-cv-67 JVB-JPK |
| WHITE COUNTY, WHITE COUNTY SHERIFF'S DEPARTMENT, BILL BROOKS, DAVID ROTH, EVAN MORROW, RYAN GLOVER, PATRICK SHAFER and MARK HELMS, | ) ) ) ) ) ) ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiffs, Nicole Baltes, Jeanne Franks, Abby Hare, Breanne Paulik, Talaina Pinkerton, Darcy Slade, Danielle Snyder, and Carrie Zook, collectively ("Plaintiffs"), by counsel, and for their Complaint for Damages against the Defendants, White County, White County Sheriff's Department, Bill Brooks, David Roth, Evan Morrow, Ryan Glover, Patrick Shafer, and Mark Helms, hereby state as follows:

## INTRODUCTION

1.    On January 4, 2019, teachers arrived at Meadowlawn Elementary School anticipating a professional development day. Most brought pens and paper, expecting to take notes. Instead, they were repeatedly attacked by law enforcement officers without explanation or warning. As part of what was ostensibly an active-shooter training, the teachers were struck by high-velocity plastic bullets and subjected to verbal threats, expletives, and screaming. The teachers displayed obvious signs of anguish and physical pain, but were humiliated to find the law

enforcement officers joking and laughing at them. The terrifying and inexplicable experience left the teachers with lasting physical and emotional injuries.

2.     This action seeks to vindicate Plaintiffs' rights under the U.S. Constitution and the common law of the State of Indiana. Defendants' violation of those rights has caused Plaintiffs lasting harm, for which compensation is now sought.

## PARTIES

3.     Plaintiff Nicole Baltes taught kindergarten at Meadowlawn Elementary School in White County, Indiana. Ms. Baltes held this position during the time of the events described in this Complaint, up until the end of the 2019-2020 school year, when she left to teach in a different school district.

4.     Plaintiff Jeanne Franks taught first grade at Meadowlawn during the time of the events described in this Complaint, up until the end of the 2018-2019 school year when Defendants' actions, described herein, were a substantial factor in her decision to retire several years earlier than planned.

5.     Plaintiff Abby Hare taught fourth grade at Meadowlawn during the time of the events described in this Complaint, up until the end of the 2018-2019 school year when Defendants' actions, described herein, caused her to resign.

6.     Plaintiff Darcy Slade taught in a self-contained classroom at Meadowlawn that serves students of various ages who have been identified as demonstrating behavioral challenges. Ms. Slade held this position during the time of the events described in this Complaint, up until the end of the 2018-2019 school year. Defendants' actions, described herein, caused Ms. Slade to decide to leave Meadowlawn. Before Ms. Slade took action on her decision, however, the school district re-organized its staff and she was transferred to another school as a result of the re-organization.

7.     Plaintiff Breanne Paulik taught fifth grade at Meadowlawn during the time of the events described in this Complaint, up until the end of the 2019-2020 school year, when she left to teach in a different school district.

8.     Plaintiff Talaina Pinkerton taught first grade at Meadowlawn during the time of the events described in this Complaint, up until the end of the 2019-2020 school year, when she left to teach in a different school district.

9.     Plaintiff Danielle Snyder currently teaches fifth grade at Meadowlawn. Ms. Snyder held this position during the time of the events described in this Complaint.

10.    Plaintiff Carrie Zook currently teaches fifth grade at Meadowlawn. Ms. Zook held this position during the time of the events described in this Complaint.

11.    Defendant White County is a municipal corporation under the laws of the State of Indiana. Ind. Code § 36–1–2–23. The County's place of business is 110 North Main Street, Monticello, Indiana 47960. At all relevant times, Defendant White County was acting under the color of state law.

12.    Defendant White County Sheriff's Department ("WCSD") is a law enforcement agency located within White County, Indiana. The Department's place of business is 915 West Hanawalt Road, Monticello, Indiana 47690. At all relevant times, Defendant WCSD was acting under the color of state law.

13.    Defendant White County and/or Defendant WCSD[1] employ all officials, officers, and members of the WCSD, including the individual defendants named in this Complaint. White

---

[1] Both White County and WCSD are named as municipal defendants here because the decisional law of this state is in conflict. Courts have reached opposite conclusions as to whether federal Section 1983 claims and supplemental state law claims are properly pled against a county or a sheriff's department. *See Hamman v. Starke County*, No. 3:18- CV-952-PPS-MGG, 2019 WL 1438294, at *2 (N.D. Ind. April 1, 2019) (discussing conflicting cases).

County and/or the WCSD are responsible for the supervision, training, official policies, customs, and practices of all WCSD employees.

14.     Defendant Bill Brooks, named in his individual and official capacity, is now and was on January 4, 2019 the Sheriff of White County, Indiana. As such, he operates as a final policymaker for Defendant White County and/or Defendant WCSD. In that capacity, he establishes policies, procedures, customs and practices regarding the conduct of the law enforcement officers named below. Defendant Brooks is responsible for the training and supervision of all employees employed in the WCSD. At all relevant times, Defendant Brooks was acting under the color of state law.

15.     Defendant Patrick Shafer, named in his individual and official capacity, is Brooks' predecessor as Sheriff of White County. Defendant Shafer held the position of Sheriff until January 1, 2019, when he retired. When Sheriff of White County, Defendant Shafer operated as a final policymaker for Defendant White County and/or Defendant WCSD. In that capacity, he established policies, procedures, customs and practices regarding the conduct of the law enforcement officers named below. When Sheriff of White County, Defendant Shafer was responsible for the training and supervision of all employees employed in the WCSD. At all relevant times, Defendant Shafer was acting under the color of state law.

16.     Defendant David Roth was at all relevant times employed by White County and/or the WCSD as the Chief Sheriff's Deputy.

17.     Defendant Evan Morrow was at all relevant times employed by White County and/or the WCSD as a Deputy Sheriff.

18.     Defendant Ryan Glover was at all relevant times employed by White County and/or the WCSD as a Community Service Officer.

19.     Defendant Mark Helms was at all relevant times employed by White County and/or the WCSD as a Deputy Sheriff. During this time, Defendant Helms was assigned to Meadowlawn as its School Resource Officer.

20.     Defendants Roth, Morrow, Glover, and Helms are employees of White County and/or the WCSD and named in their individual and official capacities. At all relevant times Defendants Roth, Morrow, Glover, and Helms were acting under the color of state law and pursuant to an official policy of White County and/or the WCSD.

## VENUE AND JURISDICTION

21.     This action arises under the Constitution and the laws of the United States and the State of Indiana and is authorized pursuant to 42 U.S.C § 1983 and the common law of the State of Indiana.

22.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and § 1367. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

23.     Venue is proper in the United States District Court for the Northern District of Indiana pursuant to 28 U.S.C § 1391(b)(2) because all events giving rise to the claim occurred in White County, Indiana.

## STATEMENT OF FACTS

24.     On January 4, 2019, a group of female teachers including Plaintiffs arrived at Meadowlawn Elementary School for a professional development day. Plaintiffs had only been informed that they would be participating in an "ALICE active-shooter training" and that some teachers had been assigned to a morning session and others to an afternoon session. Plaintiffs were not informed the training would involve any physical force, verbal abuse, threats, or personal injury.

25.     On the day of the Meadowlawn training, Defendants Roth, Morrow, Glover, and Helms (collectively, "Officers"), acting within their scope of employment and their official duties as employees in the WCSD, clothed with the power of state law, wearing apparel identifying them as WCSD law enforcement officers, and some armed with their active service weapons, conducted the training.

26.     The White County Sheriff's Department had been conducting this type of active-shooter training in White County workplaces, including schools, for several years at the time of the Meadowlawn training. On information and belief, WCSD officers received training from the ALICE Training Institute, which allowed them to become certified ALICE instructors. ALICE ("Alert, Lockdown, Inform, Counter, Evacuate") is a form of training for responding to critical incidents such as an active shooter.[2] White County Sheriff's Department has consistently maintained that the trainings they conduct are official ALICE trainings, despite the fact that, upon information and belief, official ALICE trainings do not call for shooting airsoft bullets at non-law-enforcement participants, nor ever using force on participants without first obtaining their consent.

27.     On information and belief, the prior trainings were carried out in the same or a similar manner as the Meadowlawn training. Sheriff Brooks has publicly stated that the exercises carried out in the Meadowlawn training were exactly the same as those in prior active-shooter trainings given by WCSD.[3]

28.     Among other similarities, prior trainings included the use of loaded airsoft guns. Airsoft guns are projectile weapons designed to resemble actual firearms.[4] They fire plastic bullets

---

[2] *See* https://en.wikipedia.org/wiki/Active_shooter_training (defining ALICE training).

[3] *See* https://time.com/5556979/indiana-teachers-shot-execution-style-training/ (including Brooks statement).

[4] *See* https://injury.findlaw.com/product-liability/airsoft-guns.html (defining airsoft guns).

at hundreds of feet per second. Used in military and law enforcement training, they require protective gear for safe use because they are capable of inflicting serious physical harm. Versions that fire bullets at more than 400 feet-per-second require a shooting distance of at least 100 feet. Even airsoft guns firing at lower speeds require an absolute minimum of a ten-foot shooting distance.

29.     During the Meadowlawn training, Officers consistently fired at Plaintiffs from less than ten feet away.

30.     Plaintiffs signed no waiver before participating, nor did they offer any explicit or implicit consent to any component of the training. Plaintiffs had only added their names to a list circulated at a staff meeting, generally indicating their interest in an active-shooter training. Some had subsequently confirmed their participation via e-mail. Plaintiffs wanted to participate because they believed such a training could help them protect their students.

31.     On information and belief, Plaintiffs allege the Meadowlawn training was planned and implemented by Defendant Shafer and Defendant Brooks, as White County and/or WCSD officials with final policy-making authority.

32.     On information and belief, Plaintiffs allege that Defendant Shafer, Defendant Brooks and the Officers engaged in a planning process for the Meadowlawn training and had conducted similar trainings in the past. Defendants Shafer, Brooks, and the Officers had advance knowledge of what would occur during the Meadowlawn training.

33.     On information and belief, Plaintiffs allege that Officers' conduct during the training occurred within Defendant Shafer's and Defendant Brooks' actual or constructive knowledge and explicit and/or tacit authorization.

34.     On information and belief, Plaintiffs allege that Sheriff Brooks was present for part of the Meadowlawn training. Defendant Brooks has publicly stated that to be the case.[5]

THE MORNING SESSION

35.     The morning session of the training began with participants, approximately fifteen female teachers, including Plaintiffs Franks, Slade, Baltes, and Pinkerton, and the four male Officers, gathering in a classroom. The Officers introduced themselves as police officers and said they would be conducting an "ALICE training," but they did not provide any additional details of what the training would consist of, give any indication that physical force would be used, or attempt to solicit any kind of consent. The introduction did not include any prepared presentation or training materials.

THE EXECUTION STYLE DRILL

36.     After the brief introduction, the Officers directed the teachers to break into small groups of four or five to perform the first drill in turn. Ms. Franks was in the first group to participate.

37.     Defendants Helms and Glover escorted the first small group to a different classroom. The Officers did not provide any further information about what the teachers were about to experience, either to this or any subsequent group. These and subsequent participants were handed protective goggles as they entered the room, but were provided no other safety equipment, nor any explanation as to why goggles were necessary.

38.     Defendants Morrow and Roth, who stayed behind with the remaining teachers, had full knowledge of what this first group, and each subsequent group, was to endure in this exercise (the "Execution Style Drill.")

---

[5] *See* https://www.indystar.com/story/news/politics/2019/03/21/active-shooter-training-for-schools-teachers-shot-with-plastic-pellets/3231103002/ (including Brooks statement).

39.     The first small group entered a classroom that was dark. Defendants Helms and Glover did not turn on the lights, instead directing the teachers to line up along the wall opposite the door and get down on their knees facing the wall. Teachers' location in the room gave them no clear path to the exit except through the Defendants. Each Plaintiff in this and subsequent groups was restricted in their movement during this drill, even before being shot.

40.     While teachers complied with instructions to line up and kneel down, one of the Officers, believed to be Defendant Helms, told teachers, "this is what happens if you just cower and do nothing" in response to an active shooter.

41.     Only seconds after kneeling, teachers were shot without warning by one of the Officers, believed to be Defendant Glover, with an airsoft gun. The Officer shot teachers from point-blank range, walking back and forth along the line of kneeling teachers until his gun ran out of bullets.

42.     Upon being shot, teachers immediately felt intense pain. The bullets broke skin and left teachers bleeding. Ms. Franks, shot at least twice in the back, felt a burning and stinging sensation with each shot. Both shots broke her skin, leaving welts that would take days to heal.

43.     Some teachers immediately yelled "ouch," while others cried out unintelligibly in pain. All teachers' body language showed clear signs of physical distress as they squirmed to avoid the bullets. For each Plaintiff, the Execution Style Drill was one of the most terrifying experiences of her life. Immobilized by fear and the physical force of the bullets pinning them down, participants could not turn around. Doing so would have exposed them to shots in the face and shots at even closer range. For the same reasons, escape was foreclosed for Plaintiffs each time the Execution Style Drill was carried out.

44.     Once the shooting ceased, teachers were instructed to get up and return to the first classroom. They did so in a complete state of shock. Again escorted by the Officers, they were specifically directed to tell their waiting colleagues nothing about what had just occurred, demonstrating that surprise was a conscious and deliberate element of the Execution Style Drill.

45.     Throughout the day, when Plaintiffs moved from place to place, it was at the direction of Officers. Officers escorted Plaintiffs during each transition and hovered nearby during any short breaks.

46.     The degree of control exercised by the Officers, combined with the state of shock triggered as soon as the Execution Style Drill began for each Plaintiff, made it virtually impossible for Plaintiffs to opt out of the proceedings once they were underway. Plaintiffs did not believe they had the choice to opt out once the training was underway, as they feared punishment from Officers' if they did so.

47.     In each iteration of the Execution Style Drill, the Officers were grinning or laughing when the teachers got up from their knees and turned around. Plaintiffs observed the Officers smiling, laughing, joking, and making light of events throughout the day.

48.     During the first Execution Style Drill, the remaining teachers, including Plaintiffs Baltes, Pinkerton, and Slade, waited with Defendants Roth and Morrow. Although they heard some commotion, the waiting Plaintiffs did not learn what had happened in the Execution Style Drill or begin to suspect they may be subjected to any use of physical force.

49.     Defendant Helms next directed the second small group, which included Plaintiff Baltes, to follow him. Ms. Baltes saw that the returning teachers from the first group were upset. However, those teachers complied with the Officers' command and did not disclose anything about the Execution Style Drill. Defendants Morrow and Roth were present and would have heard any

disclosures. Both morning and afternoon Plaintiffs feared punishment from the Officers if they disclosed information about the drill. All instructions given by the Officers that day were communicated as law enforcement orders, not the requests or suggestions of professional development trainers.

50.     Defendants Helms and Glover repeated the Execution Style Drill with the second small group. They once again directed teachers to line up and kneel down facing the wall and then, without warning, shot them at point-blank range. The shooter, believed to be Defendant Glover, once again walked up and down the line firing on teachers until his gun ran out of bullets. Ms. Baltes was shot three times. The impact of the high-velocity shots broke her skin and left her with a large welt.

51.     Teachers again cried out in pain, exclaiming "ouch" and "this really hurts" as they squirmed around in obvious physical pain. When the shooting subsided, Ms. Baltes stood up and glared at Defendants Helms and Glover. She was shocked to find that they were grinning back at her. Once again, Defendants instructed participants to say nothing to the waiting teachers.

52.     Defendant Helms returned with the second group and directed the third and final group, which included Plaintiffs Pinkerton and Slade, to follow him. As instructed, no teachers in the first or second groups disclosed what had occurred and the teachers in the third group were unaware of what would take place.

53.     Defendant Helms began giving his instructions to line up, stating "this is what happens when you do nothing." Worried, Ms. Slade said "wait." She asked, "so are we sitting ducks?" Defendant Helms responded casually: "yeah, I like that." He repeated the phrase, "sitting ducks."

54.     Just as in the two prior iterations of the Execution Style Drill, teachers complied with Officers' orders and were shot without warning as soon as they got on their knees. The shooter once again walked up and down the line shooting participants one by one until his gun ran out of bullets. Plaintiffs Pinkerton and Slade were each shot multiples times, with bullets breaking their skin and leaving welts, despite the fact that Ms. Slade was wearing three layers of clothing including a jacket. When they rose, some teachers with tears in their eyes, they found the men were laughing at them.

55.     Morning participants were allowed a bathroom break once they had all completed the Execution Style Drill. Once in the bathroom, teachers shared their experiences for the first time. They examined one another and found that almost every participant was bleeding and had welts on her back. Out of the earshot of the Officers for the first time, teachers expressed their shock, anger, and physical pain. Several teachers observed that even sitting in a chair was painful.

56.     During this break and in clear sight of Ms. Franks and other teachers, Defendant Helms shot another officer near his groin area. As the other officer reached down to his groin in pain, Defendant Helms chuckled, saying jokingly, "oh, sorry man, didn't mean to shoot you there."

THE ROTATING DRILLS

57.     Once all the teachers had re-assembled, the Officers announced that next, the teachers would again be split into small groups and rotated through three different drills (the "Rotating Drills"). In each drill, one participant would play the role of the teacher and the other members of the small group would play the roles of students. All small groups engaged in the Rotating Drills simultaneously.

58.     Defendant Glover played the role of an active shooter. He began each drill by striding quickly down the hallway, loudly banging on walls while screaming furiously, yelling out numerous obscenities and threats, such as "give me back my kid, you bitch," "fuck you, you

motherfuckers," and "I'm going to kill you all!" The other Officers rotated teachers from room to room, assigned participants to roles, and gave general directions to participants.

59.     In one drill, the participant playing the teacher was instructed to run and quickly close the door while those playing students ran to hide behind bookshelves, desks, chairs, or whatever classroom objects they could find (the "Run and Hide Drill"). Defendant Glover then went from classroom to classroom, entering through the unlocked doors and firing at the participants in their hiding spots, with bullets striking the cornered teachers.

60.     In another drill, the participant playing the teacher was instructed to run, lock, and barricade the door to prevent Defendant Glover from entering (the "Barricade Drill"). Defendant Glover went from classroom to classroom violently rattling doorknobs and – if possible – throwing open classroom doors and aiming directly at the cornered teachers and shooting them.

61.     The third drill required participants to throw tennis balls at Officers while they were being fired upon (the "Counter-Assault Drill"). In this exercise, multiple Officers shot at teachers at the same time. Throwing the tennis balls forced the participants to stand up and further expose themselves to being shot. Ms. Pinkerton was shot in her stomach, resulting in a permanent scar. Ms. Franks felt too frightened to rise and throw tennis balls, so she stood frozen in a corner of the room for the entirety of the drill, hoping not to get shot. Ms. Baltes was shot forcefully in the stomach and knew she could not bear to be shot again. She crawled under a table and curled up in the fetal position. An officer, believed to be Defendant Glover, quickly found her, aimed directly at her body, and shot her three times while she was immobile.

62.     Throughout the Rotating Drills, Officers repeatedly smirked, laughed, and joked, including in moments when teachers were being hit with bullets, crying out in pain, or demonstrating extreme fear.

63.     Upon conclusion of the Rotating Drills, the Officers escorted the teachers into the gymnasium. Defendant Helms delivered no prepared presentation or educational materials, only saying a few brief words before dismissing the teachers. Once released, the teachers again had the opportunity to assess their physical condition. Plaintiffs and other teachers identified areas of bruising, bleeding, welts, and broken skin.

<u>THE AFTERNOON SESSION</u>

64.     While the morning session was ongoing, teachers scheduled for the afternoon session worked in their own classrooms in a separate wing of the school building. Those teachers included Plaintiffs Zook, Hare, Snyder, and Paulik.

65.     The afternoon Plaintiffs did not see or hear anything to indicate that the morning session involved teachers being subjected to physical force in any way, much less being shot repeatedly at close range and injured. Prior to their session, the afternoon Plaintiffs had no contact with morning participants.

66.     The afternoon session began with participants, approximately 20 female teachers, gathering in the school library. The school's principal at the time, Casey Davenport, was also present to observe the afternoon session. Only three of the four Officers were present at the afternoon session: Defendants Helms and Glover and a third officer, believed to be Defendant Roth. As in the morning session, Defendants wore insignia identifying themselves as WCSD officers and some were armed with service weapons. As before, they introduced themselves as police officers and characterized the activity as an ALICE training.

67.     As in the morning session, the Officers provided no information about what would occur and gave no indication that any amount of physical force would be used on teachers. Following a brief introduction, the Officers instructed teachers to break into small groups. All

14

Plaintiffs who participated in the afternoon session (Zook, Hare, Snyder, and Paulik) were in the first group to participate.

THE EXECUTION STYLE DRILL

68.     Defendant Helms instructed the first group to follow him into a classroom in which the lights were out and the blinds were drawn. In the afternoon, the Execution Style Drill was conducted solely by Defendant Helms. Principal Davenport was present as an observer.

69.     Defendant Helms directed the teachers to line up against the wall farthest from the door and get down on their knees. Defendant Helms positioned himself directly between the teachers and the doorway. Plaintiff Snyder asked what was about to happen and whether he was about to shoot them. Defendant Helms did not respond to Ms. Snyder's question, so she repeated it. He then turned to Ms. Snyder and said "shut up" and directed her to "stop asking questions."

70.     Defendant Helms began shooting the teachers as soon as they were on their knees. Teachers immediately cried out in pain. A bullet struck Ms. Zook so forcefully that she lost her balance and fell into Ms. Snyder's arms. Plaintiffs Snyder, Zook, and Paulik then hugged each other and curled up on the floor together, trying to shield themselves and each other from the bullets.

71.     In the morning session, Defendant Glover had walked along the line of kneeling teachers shooting each one individually, but now Defendant Helms stood in one position while rapidly shooting back and forth hitting teachers with a constant spray of bullets.

72.     Ms. Zook was shot approximately four times in the back, while Plaintiffs Snyder and Hare were each struck approximately twice. Ms. Paulik, by curling her body under Ms. Zook, was able to avoid getting shot. All shots that made contact with Plaintiffs left welts, with multiple shots breaking the skin, causing bleeding, and leaving bruises.

73.     Once the shooting ceased, Ms. Snyder stood up angrily, glared at Defendant Helms, and demanded to know what had just happened: "Why did you shoot us?" Defendant Helms smiled, laughed, and responded "that's just part of the training." He then instructed teachers to return to the library, be quiet, and to tell no one what had just occurred.

74.     Once the afternoon Plaintiffs had returned to the library, they urged other teachers to put on more layers of clothing because they were about to be shot. No Plaintiffs were in the groups that received these warnings. Plaintiffs had to whisper their warnings because at least one Defendant was close by.

75.     While waiting for other groups to complete the Execution Style Drill, teachers talked in hushed voices. Some pulled up their shirts to compare wounds. They expressed shock, anger, and emotional upset.

76.     Once all afternoon participants had completed the Execution Style Drill, they gathered in the library with the three Officers. Ms. Hare and others expected an explanation of the purpose of the drill, but Defendant Helms simply stated that it was "what happens when you do nothing."

77.     On information and belief, the Execution Style Drill was conducted in the same manner for all small groups who participated in the afternoon.

THE ROTATING DRILLS

78.     Officers then broke teachers into groups to complete the Rotating Drills. The simulations were structured as in the morning, with Defendant Glover reprising his role as the active shooter. While conducting the simulations, he once again banged on walls, screamed threats, and yelled numerous expletives.

79.     Officers again shot at teachers during each of the Rotating Drills. During one Run and Hide Drill, Defendant Glover shot at teachers who were attempting to hide and hit multiple participants, including Ms. Snyder.

80.     In a Barricade Drill, Ms. Paulik played the role of the teacher. She was unable to lock her door because a trash bag was caught over the lock. When Defendant Glover entered the room, he immediately aimed his gun directly at Ms. Paulik's face, holding it just inches away. While Defendant Glover kept his gun trained at her face, Ms. Paulik was terrified she would imminently be shot in the head. Defendant Glover turned his gun only slightly to aim at other participants and opened fire. Each shot exploded as a loud pop next to Ms. Paulik's ear.

81.     One of the bullets fired by Defendant Glover narrowly avoided hitting Ms. Snyder in the face, while others loudly hit the metal cabinet door she was using to hide. After Defendant Glover exited the room, Ms. Snyder, terrified by what had just occurred, told Ms. Paulik "oh my god, I'm afraid I'd be dead if this were real."

82.     In another iteration of the Barricade Drill, Ms. Snyder played the role of the teacher. She was successful in locking the door before Defendant Glover could enter. A few minutes later, Officers returned to tell Ms. Snyder the simulation was over and that she could unlock her door. Still terrified, Ms. Snyder refused to open the door, stating that there was no way she ever would. Ms. Snyder believed that if she did, Officers would just shoot her and her colleagues again. After over a minute of Officers repeatedly asking Ms. Snyder to be let in, Ms. Paulik got up and opened the door on Ms. Snyder's behalf.

83.     During one Counter-Assault Drill, Ms. Hare was shot one or two times while Ms. Zook was shot at least once. Both Ms. Snyder and Ms. Paulik were too scared to be shot again, so they gave their tennis balls to other participants and attempted to hide for the entirety of the drill.

An officer, believed to be Defendant Glover or Helms, intimidated Ms. Snyder by loudly yelling

at her. The officer accused her of breaking the rules and not doing the drill "right." Distressed, Ms.

Snyder blurted out "I don't care! I don't care! I'm not doing it the way you want" because she

could not bear to be assaulted again.

84.     In the afternoon session, as in the morning session, Plaintiffs witnessed Defendants

laughing on multiple occasions, usually when teachers were either being hit with bullets, crying

out in pain, or demonstrating fear.

85.     After the Rotating Drills had ended, all afternoon participants, in a haze of shock

due to what they had endured, were escorted back into the library. Defendant Helms said a few

brief words before stating that the training was over and the teachers were dismissed. Afternoon

participants received no training materials or prepared presentations at any time.

86.     All participants, including Plaintiffs, complied with the Officers' instructions

throughout the entirety of the Meadowlawn training and at no time during either the morning or

afternoon sessions did any participant pose a threat to the Officers' safety or interfere with the

Officers' duties in a way that would require any of the Officers to use force.

87.     At no time during the Meadowlawn training did any Officer attempt to intervene

into another's actions or tell the other Officers to stop shooting teachers or change their actions in

any way, despite ample opportunity to do so.

PLAINTIFFS' INJURIES

88.     As a direct and proximate result of Defendants' actions, Plaintiffs experienced

significant physical pain throughout the training. Plaintiffs suffered physical injuries, including

bruising, bleeding, welts, and broken skin.

89.     As a direct and proximate result of Defendants' actions, Plaintiffs continued to feel

physical pain and discomfort long after the training was over. A shot taken at close range during

the Counter-Assault Drill left Ms. Pinkerton with a permanent scar. Ms. Slade had multiple bruises that caused severe pain and forced her to change the way she slept for over a month. Plaintiffs Zook and Franks had bruises and cuts that took days to heal. Plaintiffs Snyder, Hare, Baltes, and Pinkerton had bruises and cuts that took weeks to heal.

90.     As a direct and proximate result of Defendants' actions, Plaintiffs Franks and Pinkerton each used over-the-counter pain medication to treat the injuries caused by Defendants, which they paid for with personal funds.

91.     As a direct and proximate result of Defendants' actions, Ms. Pinkerton was treated by a medical doctor for the injury that resulted in a permanent scar. She contributed personal funds to pay for this treatment.

92.     As a direct and proximate result of Defendants' actions, Plaintiffs experienced severe emotional distress throughout the training, including extreme states of fear, anxiety, and the humiliation of having Officers joke, laugh, and smirk at their fear and physical pain.

93.     Each of the Plaintiffs held law enforcement officers in positive regard prior to the training and trusted them to be professional and helpful. Several have close relationships with law enforcement officers. Ms. Pinkerton's husband, Ms. Baltes' brother-in-law, and Ms. Franks' daughter-in-law all serve in law enforcement.

94.     As a direct and proximate result of Defendants' actions, Plaintiffs continued to experience severe emotional distress long after the training was over. Ms. Snyder was emotionally changed as a teacher and now experiences elevated levels of fear and anxiety while doing her job. After the training, Ms. Pinkerton experienced bursts of anger against people close to her and struggled to focus on basic tasks at home. Previously an open and trusting person, Ms. Franks' trust in others was deeply violated by Defendants' actions. Given that the Defendants

administering the attacks were in law enforcement – the occupation she had viewed as the most trustworthy in society – she now believes there is no one she can trust. The Meadowlawn training has negatively impacted the relationships in her life. All of Plaintiffs' varying forms of emotional distress continue to the present day.

95.     As a direct and proximate result of Defendants' actions, Plaintiffs Hare and Pinkerton were treated by psychiatric professionals. Both Plaintiffs contributed personal funds to the cost of their psychological treatment.

96.     As a direct and proximate result of Defendants' actions, Ms. Pinkerton was diagnosed with Post-Traumatic Stress Disorder ("PTSD")[6] and continues to take prescription medication to the present day. She contributes personal funds to the cost of the prescription medication.

97.     As a direct and proximate result of Defendants' actions, Plaintiffs experience increased anxiety and fear when they are around the Officers who conducted the training. Ms. Pinkerton is anxious and uncomfortable around Officer Helms, the School Resource Officer for Meadowlawn Elementary. Ms. Slade also reports being terrified of Officer Helms and has even learned how to record conversations on her cell phone because she fears he will barge into her classroom and verbally berate her. Ms. Snyder is terrified of Officer Glover, going out of her way to avoid him around town. She has frequent flashbacks to the threatening expletives he screamed at teachers during the Rotating Drills. Each of the Plaintiffs' fear of the Officers continues to the present day.

98.     As a direct and proximate result of the Defendants' actions, Plaintiffs Hare and Slade experience increased anxiety and fear around all law enforcement officers. Plaintiff Hare is

---

[6] *See* https://www.nimh.nih.gov/health/topics/post-traumatic-stress-disorder-ptsd/index.shtml (defining PTSD).

scared when she sees police officers in public and is uncomfortable in their presence, often having to leave places where there is any police presence, even in casual settings like a restaurant. Prior to the training, Plaintiff Slade had complete faith and trust in law enforcement, but that was destroyed by Officers' actions. Plaintiffs Hare and Slade's fear of law enforcement continues to the present day.

99.     As a direct and proximate result of Defendants' actions, Plaintiffs Pinkerton, Baltes, Snyder, Zook, and Paulik experience heightened anxiety during school lockdown drills that are required for their employment. In the fall of the following school year, Meadowlawn Elementary conducted an unannounced lockdown drill that terrified them. During that drill, Ms. Snyder was brought back to the January 2019 training and was terrified an intruder was coming to kill her. Her fear manifested in physical symptoms like shaking. She was panicking and experiencing far more anxiety than in similar drills in the past. Ms. Baltes was terrified that the drill was real and feared she could not protect her students. She kept thinking back to the training, which increased her fear and anxiety. As her fear rose, she texted another teacher to tell her she believed this was not a drill but was instead the "real deal." Plaintiff Baltes felt less prepared to protect her students and address a potential threat than she had in similar lockdown drills prior to the January 2019 training.

100.    As a direct and proximate result of Defendants' actions, Plaintiffs Franks and Baltes experience increased fear and anxiety around firearms. Ms. Baltes had always been comfortable around firearms and would often go hunting or to the gun range for recreation. She has been unable to engage in either activity since the training, which caused her to lose the confidence and comfort she once felt around firearms. Ms. Franks had long been scared of firearms, but in the years leading up to the training had made tremendous strides in overcoming her fear, to the point where she was able to go to the gun range annually with family members. After the training, Ms. Franks reverted

back to a point where she is more afraid of firearms than ever before. Following the training, she made one attempt to return to the gun range with her family, but as soon as she picked up a gun, she immediately put it back down, too scared to even hold it.

101.     It was not unusual for violence to erupt in Plaintiff Slade's self-contained classroom for students with diagnosed emotional disorders. Prior to the training, she often called the WCSD to send officers to protect her from physical harm. However, as a direct and proximate result of the Defendants' actions, including subsequent actions outlined in further detail below, Ms. Slade no longer trusted WCSD officers to assist her or conduct themselves professionally. As this lack of officer assistance left her vulnerable to potential violence, Ms. Slade decided she could no longer continue in her position at Meadowlawn and that she would leave at the end of the school year. Ms. Slade began taking interviews for positions with different school districts. Subsequent to her decision to leave, the district re-organized school staffing, which resulted in Ms. Slade's transfer from Meadowlawn.

102.     As a direct and proximate result of Defendants' actions, Ms. Franks, who taught for 27 years, retired several years earlier than planned. That loss of pension credit years has resulted in diminished retirement benefits.

103.     As a direct and proximate result of Defendants' actions, Ms. Hare resigned from her employment at Meadowlawn and found a job in a new school district after the 2018-2019 school year.

<u>THE ROLE OF DEFENDANTS WHITE COUNTY AND WCSD</u>

104.     White County and/or the WCSD, implicitly and/or explicitly, adopted and implemented the unconstitutional official policy, custom, and/or practice of conducting what WCSD employees refer to as "ALICE drills" in a way that violates participants' constitutional rights.

105.    The official policy of White County and/or WCSD of conducting ALICE trainings in the unconstitutional manner described herein directly and proximately caused the violation of Plaintiffs' constitutionally protected rights and all additional resulting injuries described herein.

106.    The injuries suffered by Plaintiffs were also a direct and proximate result of White County and/or WCSD, and Defendants Shafer and Brooks' failure to properly train WCSD officers.

107.    By failing to properly train WCSD Officers on how to safely conduct an active-shooter training compliant with participants' constitutional rights, White County and/or WCSD, and Defendants Shafer and Brooks demonstrated deliberate indifference to the constitutional rights of Plaintiffs.

108.    The multiple active-shooter trainings conducted by the White County Sheriff's Department over the course of multiple years constituted a repeated pattern of constitutional violations. Municipal policymakers, including Defendants Shafer and Brooks, had or should have had direct knowledge of these continuing violations, making the need for adequate training of officers plainly obvious.

109.    The inadequacy of officers' training and the likelihood of it resulting in constitutional violations was patently obvious. Municipal policymakers, including Defendants Shafer and Brooks, knew or should have known that the lack of adequate training and supervision provided to officers was reckless, unnecessarily dangerous, and/or done with calculated and deliberate indifference to the rights of training participants, including Plaintiffs, with whom officers would inevitably come into contact during the course of their duties.

110.    White County and/or WCSD, and Defendants Shafer and Brooks directly and proximately caused the violation of Plaintiffs' constitutionally protected rights and all resulting injuries described herein by failing to properly train and/or supervise WCSD Officers.

DEFENDANTS' RESPONSE TO BEING QUESTIONED ABOUT<br>THE PROPRIETY OF THEIR CONDUCT DURING THE MEADOWLAWN TRAINING

111.    Following the Meadowlawn training, Barbara Broedel, President of the Twin Lakes Classroom Teachers Organization informed Michael Galvin, Twin Lakes School Corporation Superintendent, that Defendants shot teachers with airsoft guns during the training.  She raised concerns about the Defendants' conduct to Mr. Galvin on behalf of union-member teachers within the Twin Lakes School Corporation, including Plaintiffs.

112.    Mr. Galvin then organized a meeting, held on or about February 25, 2019, to communicate to WCSD that the teachers were upset about how Defendants had conducted the Meadowlawn training.  The meeting attendees included Ms. Broedel, Mr. Galvin, Defendant Brooks and Defendant Helms, among others.

113.    In the course of the February 25 meeting, Defendants Helms and Brooks became angry and defensive that their conduct was being questioned.  Defendant Helms stated that anyone who was upset about being shot at the training is not fit to be a teacher.  Defendant Brooks stated that WCSD would not provide any future trainings to the Twin Lakes School Corporation.

114.    A few days after the February 25 meeting, Defendant Helms showed up in Plaintiff Slade's classroom and, while in the presence of students, expressed anger that Meadowlawn teachers were upset about the training.  He referred to the complaining teachers as "a bunch of candy-asses" and said "if they can't take a bullet they shouldn't be in the classroom," or words to that effect.

115.    Shortly thereafter, an incident occurred in Plaintiff Slade's self-contained classroom whereby a student became violent.  After unsuccessfully attempting to de-escalate the situation, Ms. Slade sought assistance from the WCSD School Resource Officer.

116.    This was not an uncommon occurrence.  Since 2014, Ms. Slade taught a group of students who struggled with behavioral challenges and who often became aggressive in school. Under those circumstances, for the sake of her and her students' safety, Ms. Slade frequently called upon the WCSD School Resource Officer, Defendant Helms, to help restrain a student who was acting violently.  In the past, when Defendant Helms was not available, WCSD always sent a different officer to assist Ms. Slade.

117.    However, in response to her request for the School Resource Officer's help on this particular occasion following the February 25 meeting, Ms. Slade was told that no one from the WCSD was available to assist her.

118.    On or about March 13, 2019, Plaintiff Slade again requested help from the School Resource Officer after a student became violent and, among other things, attempted to break Ms. Slade's arm.  In response to her request for help, Ms. Slade was again informed that no one from the WCSD was available to assist her.

119.    On belief, no WCSD officer assisted Plaintiff Slade on these occasions because either Defendant Helms refused to respond to the calls for assistance or because Defendant Brooks decided as a policy matter that WCSD would not respond to the calls for WCSD's assistance.

120.    On both of the above-referenced occasions, as she attempted to restrain a student without the help of law enforcement, Ms. Slade experienced fear and anxiety that she would suffer serious injury, particularly during the March 13 incident when she feared that the student would succeed in breaking her arm.

121.    As a direct and proximate result of Defendants' sudden failure to provide any assistance in response to her requests for help, Plaintiff Slade believed she could no longer work at Meadowlawn and began looking for a new teaching job.

## CLAIMS FOR RELIEF

### COUNT I - 42 USC § 1983 Fourth Amendment Violation –

### Unreasonable Seizure

**(Against all Defendants for Execution Style Drills)**

122.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

123.    While conducting the entirety of the active-shooter training at Meadowlawn Elementary School on January 4, 2019, all Defendants were acting under the color of state law in their actions and inactions.

124.    Officers were acting within their official duties as WCSD employees, and were dressed in uniform and/or other apparel identifying them as employees of the WCSD and verbally identified themselves as employees of the WCSD.

125.    Officers' conduct during the entirety of the Meadowlawn training was performed pursuant to a formal municipal policy of White County and/or the WCSD, or alternatively, a custom or practice of White County and/or the WCSD that is so entrenched that it amounts to an informal policy. Said policy directly and proximately caused the violation of Plaintiffs' constitutionally protected rights and all additional resulting injuries described herein.

126.    Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Brooks and Shafer, who in the role of White County Sheriff, were final policymakers for White County and/or the WCSD.

127.    Officers' conduct was the direct and proximate result of the failure by Defendants Brooks and Shafer and Defendants White County and/or the WCSD to properly train WCSD officers.

128.    Defendant Shafer, Defendant Brooks, and Defendant Officers engaged in a planning process for the Meadowlawn training, acting in concert to deprive Plaintiffs of their constitutional rights. Thus, they are each jointly liable for all of Plaintiffs' resulting injuries.

129.    Defendant Shafer, Defendant Brooks, and Defendant Officers had direct knowledge of what would occur during the Meadowlawn training and each had a realistic opportunity, and yet failed, to intervene and prevent the unconstitutional conduct of other Defendants at any point before or during the Meadowlawn training.

130.    Defendants intentionally limited Plaintiffs' freedom of movement when they led Plaintiffs into a separate classroom, gave them verbal instructions to line up and kneel down facing the wall, and then positioned themselves between Plaintiffs and the sole exit of the classroom. Defendants then further limited Plaintiffs' freedom of movement when they exerted physical force upon Plaintiffs by shooting at and striking them repeatedly with high-velocity plastic bullets at close range.

131.    As a direct result of Defendants' commands and the physical force of being shot at and hit with bullets, Plaintiffs' freedom of movement was meaningfully restricted and a reasonable person under the circumstances would have understood they were not free to leave.

132.    Defendants' actions, which included shooting Plaintiffs multiple times at close range without forewarning while Plaintiffs were lined up execution style, were objectively unreasonable in light of the facts and circumstances confronting officers.

133.    Defendants' seizure of Plaintiffs was without any legal justification or privilege on the part of Officers. Plaintiffs posed no threat to Officers, Officers had no probable cause or reasonable suspicion of wrongdoing by Plaintiffs, and no other exigent circumstances existed.

134.    Defendants' conduct showed a reckless and callous indifference to Plaintiffs' constitutional rights, as well as a reckless disregard for the safety and welfare of Plaintiffs.

135.    Defendants' seizure of Plaintiffs was unreasonable and in violation of Plaintiffs' clearly established Fourth Amendment rights of which a reasonable officer would know, including that police cannot seize citizens who are not suspected of any wrongdoing without legal justification, and that the scope of any seizure must be related to the seizure's underlying justification.

## COUNT II - 42 USC § 1983 Fourth Amendment Violation –

## Unreasonable Seizure

### (Against all Defendants for the Rotating Drills)

136.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

137.    During the Run and Hide Drill, the Barricade Drill, and the Counter-Assault Drill, Defendants intentionally limited Plaintiffs' freedom of movement by ordering them into rooms and hiding places behind closed and locked doors. Defendants further limited Plaintiffs' freedom of movement by shooting at and striking them with high-velocity plastic bullets from close range.

138.    As a direct result of Defendants' orders and the physical force of being shot at and struck with bullets, Plaintiffs' freedom of movement was meaningfully restricted and a reasonable person under the circumstances would have understood they were not free to leave.

139.    Defendants' actions during the Rotating Drills were objectively unreasonable in light of the facts and circumstances confronting officers.

140.    Defendants' seizure of Plaintiffs during the Rotating Drills was without any legal justification or privilege on the part of Officers. Plaintiffs posed no threat to Officers, Officers had no probable cause or reasonable suspicion of wrongdoing by Plaintiffs, and no other exigent circumstances existed.

141.    Defendants' conduct showed a reckless and callous indifference to Plaintiffs' constitutional rights, as well as a reckless disregard for the safety and welfare of Plaintiffs.

142.    Defendants' seizure of Plaintiffs was unreasonable and in violation of Plaintiffs' clearly established Fourth Amendment rights of which a reasonable officer would know, including that police cannot seize citizens who are not suspected of any wrongdoing without legal justification, and that the scope of any seizure must be related to the seizure's underlying justification.

### COUNT III - 42 USC § 1983 Fourth Amendment Violation –

### Excessive Force

**(Against all Defendants for Execution Style Drills)**

143.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

144.    As outlined above, Defendants conducted a seizure of Plaintiffs' persons when conducting the Execution Style Drill.

145.    Defendants' use of force during the Execution Style Drill, which included shooting Plaintiffs multiple times without forewarning from a distance below the minimal safety requirement for the proper use of airsoft guns, was excessive and objectively unreasonable in light of the facts and circumstances confronting Officers.

146.    At the time of the shooting, Plaintiffs posed no threat of danger to Officers and were not under arrest, armed, or interfering with police duties. Officers made no efforts to mitigate

the amount of force used or to obtain consent from Plaintiffs. The amount of force used was significant, resulting in areas of bruising, bleeding, welts, and broken skin.

147.    The severe nature of the physical intrusion that Plaintiffs experienced greatly outweighed the importance of any purported governmental interest in using force. No amount of force is necessary to properly conduct an active-shooter training for non-law-enforcement participants. The Meadowlawn training, while involving extensive physical force, involved little to no educational content. Officers did little to introduce the training or its purpose before beginning the Execution Style Drill. Officers also offered no explanation for why it was necessary to shoot Plaintiffs without forewarning multiple times at close range in order to teach them what happens when they "do nothing" in response to an active shooter. Any potential justification was diminished by the fact that Officers repeatedly smirked, laughed, and made jokes in response to Plaintiffs exhibiting signs of pain and fear.

148.    Defendants' conduct showed a reckless and callous indifference to Plaintiffs' constitutional rights, as well as a reckless disregard for the safety and welfare of Plaintiffs.

149.    The amount of force used by officers to effectuate the seizure of Plaintiffs was excessive and in violation of Plaintiffs' clearly established Fourth Amendment rights of which a reasonable officer would know, including that police can only use non-lethal weapons in rare circumstances that require forewarning, and that police should not use any amount of force on individuals who pose no threat to officers and are passive.

150.    As a direct and proximate result of the force used by Defendants, Plaintiffs sustained injuries in the form of appreciable pain, bruising, bleeding, welts, and continuing emotional distress.

**COUNT IV - 42 USC § 1983 Fourth Amendment Violation –**

**Excessive Force**

**(Against all Defendants for the Rotating Drills)**

151.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

152.    As outlined above, Defendants conducted a seizure of Plaintiffs' persons during the Rotating Drills, which included the Run and Hide Drill, the Barricade Drill, and the Counter-Assault Drill.

153.    Defendants' use of force during the Rotating Drills, which included repeatedly shooting at and striking Plaintiffs with bullets, often from distances below the minimal safety requirement for the proper use of airsoft guns, was excessive and objectively unreasonable in light of the facts and circumstances confronting officers.

154.    At no time during the Rotating Drills did Plaintiffs pose any threat of danger to Officers, nor were they under arrest, armed, or interfering with police duties. Officers made no efforts to mitigate the amount of force used throughout the Rotating Drills. The amount of force used was significant, resulting in areas of bruising, bleeding, welts, broken skin, and one permanent scar.

155.    The severe nature of the physical intrusion Plaintiffs experienced greatly outweighed the importance of any purported governmental interest in using force. Defendants offered no justification for why it was necessary to repeatedly shoot Plaintiffs with airsoft guns throughout the Rotating Drills. Any potential justification was diminished by the fact Defendants repeatedly smirked, laughed, and made jokes in response to Plaintiffs exhibiting signs of pain and fear.

156.    Defendants' conduct showed a reckless and callous indifference to Plaintiffs' constitutional rights, as well as a reckless disregard for the safety and welfare of Plaintiffs.

157.    The amount of force used by Officers to effectuate the seizure of Plaintiffs was excessive and in violation of Plaintiffs' clearly established Fourth Amendment rights of which a reasonable officer would know, including that police can only use non-lethal weapons in rare circumstances that require forewarning, and that police should not use any amount of force on individuals who pose no threat to officers and are passive.

158.    As a direct and proximate result of the force used by Defendants, Plaintiffs sustained injuries in the form of appreciable pain, bruising, bleeding, welts, scarring and continuing emotional distress.

## COUNT V - 42 USC § 1983 Fourteenth Amendment Violation –

### Substantive Due Process

**(Against all Defendants for the Execution Style Drills)**

159.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

160.    Plaintiffs have a constitutionally protected liberty interest to be free from arbitrary intrusions on their personal security, bodily integrity, and physical and emotional wellbeing.

161.    Defendants deprived Plaintiffs of this protected liberty interest when they shot them multiple times at close range without forewarning or consent during the Execution Style Drill.

162.    This intrusion on Plaintiffs' bodily integrity and physical wellbeing was severe, as it resulted in appreciable physical pain and areas of bruising, bleeding, welts, and broken skin.

163.    The intrusion on Plaintiffs' personal security and emotional wellbeing was also severe. Plaintiffs experienced intense emotional distress, extreme fear and anxiety, and humiliation as a direct result of Defendants' conduct.

164.    Defendants' actions were arbitrary and so outrageous as to shock the conscience. The Meadowlawn training was a pre-planned event that provided Defendants opportunity for forethought. It was not a dangerous situation requiring Defendants to make split-second decisions. Defendants consciously disregarded the potential harm to Plaintiffs in planning and performing the Execution Style Drill.

165.    Defendants demonstrated a conscious disregard of the potential harm they were causing Plaintiffs by shooting Plaintiffs in the manner described above while ignoring Plaintiffs' questions, protestations, and exclamations of pain. Defendants deliberately maximized the element of surprise and increased the physical and emotional harm Plaintiffs experienced when they forbade participants from sharing information. Defendants abused their position of power as police officers to affect a battery on an unarmed group of female elementary school teachers who complied with their orders and posed no threat to them.

166.    Defendants' conduct, outlined in the above Paragraph, also demonstrates that they acted maliciously for the purpose of causing harm to Plaintiffs.

167.    Defendants' conduct showed a reckless and callous indifference to Plaintiffs' constitutional rights, as well as a reckless disregard for the safety and welfare of Plaintiffs.

168.    Defendants' actions deprived Plaintiffs of a protected liberty interest and violated Plaintiffs' clearly established Fourteenth Amendment rights of which a reasonable officer would know, including that public officials may not abuse their positions of power in order to affect a battery.

169.    The deprivation of this liberty interest was the direct and proximate cause of the physical and emotional injuries Plaintiffs experienced.

**COUNT VI - 42 USC § 1983 Fourteenth Amendment Violation – Substantive Due Process**

**(Against all Defendants for the Rotating Drills)**

170.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

171.    Plaintiffs have a constitutionally protected liberty interest to be free from arbitrary intrusions on their personal security, bodily integrity, and physical and emotional wellbeing.

172.    Defendants deprived Plaintiffs of this liberty interest when they continued to shoot at Plaintiffs during the Rotating Drills, often from distances below the minimal safety requirement for the proper use of airsoft guns.

173.    This intrusion on Plaintiffs' bodily integrity and physical wellbeing was severe, as it resulted in appreciable physical pain and areas of bruising, bleeding, welts, broken skin, and scarring.

174.    The intrusion on Plaintiffs' personal security and emotional wellbeing was also severe. Plaintiffs experienced intense emotional distress, extreme fear and anxiety, and humiliation as a direct result of Defendants' conduct.

175.    Defendants' actions were arbitrary and so outrageous as to shock the conscience. The Meadowlawn training was a pre-planned event that provided Defendants opportunity for forethought. It was not a dangerous situation requiring Defendants to make split-second decisions. Defendants consciously disregarded the potential harm to Plaintiffs in planning and performing the Rotating Drills.

176.    Defendants demonstrated a conscious disregard of the potential harm they were causing Plaintiffs by continuing to unnecessarily shoot at Plaintiffs throughout the Rotating Drills while laughing, smirking, and making jokes when Plaintiffs exhibited signs of fear and pain. In

doing so, Defendants abused their position of power as police officers to affect a battery on an unarmed group of female elementary school teachers.

177.    Defendants' conduct demonstrates that they acted maliciously for the purpose of causing harm to Plaintiffs.

178.    Defendants' conduct showed a reckless and callous indifference to Plaintiffs' constitutional rights, as well as a reckless disregard for the safety and welfare of Plaintiffs.

179.    Defendants' actions deprived Plaintiffs of a protected liberty interest and violated Plaintiffs' clearly established Fourteenth Amendment rights of which a reasonable officer would know, including that public officials may not abuse their positions of power in order to affect a battery.

180.    The deprivation of this liberty interest was the direct and proximate cause of the physical and emotional injuries Plaintiffs experienced.

### COUNT VII - Indiana State Law Claims for False Imprisonment

### (Against all Defendants for the Execution Style Drills)

181.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

182.    White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

183.    Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

184.    Defendant Shafer, Defendant Brooks, and Defendant Officers engaged in a planning process for the Meadowlawn training, acting in concert to deprive Plaintiffs of their rights under state law. Thus, they are each jointly liable for all of Plaintiffs' resulting injuries.

185.    Officers, acting within their scope of employment and official duties as White County and/or WCSD employees, intentionally limited Plaintiffs' freedom of movement and deprived them of their liberty when they led Plaintiffs into a separate classroom, gave them verbal instructions to line up and kneel down facing the wall, and then positioned themselves between Plaintiffs and the sole exit of the classroom. Officers then further limited Plaintiffs' freedom of movement when they exerted physical force upon Plaintiffs by shooting them multiple times at close range.

186.    As a direct result of Officers' commands and the physical force of being shot at and struck with bullets, Plaintiffs' freedom of movement and personal liberty were severely restricted and a reasonable person under the circumstances would have understood they were not free to leave.

187.    Plaintiffs did not consent, expressly or implicitly, to having their freedom of movement restrained by Defendants in such a manner.

### COUNT VIII - Indiana State Law Claims for False Imprisonment

### (Against all Defendants for the Rotating Drills)

188.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

189.    White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

190.    Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

191.    During the Run and Hide Drill, the Barricade Drill, and the Counter-Assault Drill, Officers intentionally limited Plaintiffs' freedom of movement by ordering them into rooms and

hiding places behind closed and locked doors. Officers further limited Plaintiffs' freedom of movement by shooting at and striking them from close range during these drills.

192.   As a direct result of Officers' orders and the physical force of being shot at and struck with bullets, Plaintiffs' freedom of movement was severely restricted and a reasonable person under the circumstances would have understood they were not free to leave.

193.   Plaintiffs did not consent, expressly or implicitly, to having their freedom of movement restrained by Defendants in such a manner.

## COUNT IX - Indiana State Law Claims for Assault and Battery

### (Against all Defendants for Execution Style Drill)

194.   Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

195.   White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

196.   Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

197.   Officers, acting within their scope of employment and official duties as White County and/or WCSD employees, intended to cause harmful or offensive contact with Plaintiffs and/or to put them in imminent apprehension of such contact when they led them into a dark classroom and directed them to line up on their knees facing the wall. Said harmful contact then directly resulted when Officers shot at and struck Plaintiffs multiple times at close range without Plaintiffs' consent and without any forewarning.

198.   At the time of the shooting, Plaintiffs posed no threat of danger to Officers and were not under arrest, armed, or interfering with police duties.

199.    At no time during the Execution Style Drill were Defendants engaged in the enforcement of a law, rule, or regulation.

200.    As a direct and proximate result of the assault and battery committed by Defendants, Plaintiffs sustained injuries in the form of appreciable pain, bruising, bleeding and welts and continuing emotional distress.

## COUNT X - Indiana State Law Claims for Assault and Battery

### (Against all Defendants for the Rotating Drills)

201.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

202.    White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

203.    Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

204.    Officers intended to cause harmful or offensive contact with Plaintiffs and/or to put them in imminent apprehension of such contact when they ordered Plaintiffs into rooms and hiding places behind closed and locked doors, while Officer Glover came down the hallway yelling threats and expletives before entering and/or attempting to enter Plaintiffs' classrooms. Said harmful contact directly resulted as Officers continued to shoot at and strike Plaintiffs with bullets during the Rotating Drills. Each time Officers shot at Plaintiffs they intended to make physical contact, and in many cases bullets did make contact and cause significant harm to Plaintiffs.

205.    At no time during the Rotating Drills did Plaintiffs pose any threat of danger to Officers, nor were they under arrest, armed, or interfering with police duties.

206.    At no time during the Rotating Drills were Defendants engaged in the enforcement of a law, rule, or regulation.

207.    As a direct and proximate result of the assault and battery committed by Defendants, Plaintiffs sustained injuries in the form of intense pain, bruising, bleeding, welts and scarring and continuing emotional distress.

## COUNT XI - Indiana State Law Claims for Intentional Infliction of Emotional Distress

### (Against all Defendants for the Execution Style Drills)

208.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

209.    White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

210.    Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

211.    Officers, acting within their scope of employment and official duties as White County and/or WCSD employees, acted outrageously and with intent to cause severe emotional distress to Plaintiffs and/or acted in reckless disregard of the probability of causing emotional distress. Defendants' conduct did, in fact, proximately cause Plaintiffs to suffer severe and extreme emotional distress.

212.    Defendants abused their position of power, authority, and trust to maximize the emotional distress experienced by Plaintiffs. Officers intentionally withheld from Plaintiffs the fact that they would be shot at close range and instructed all participants not to tell others about what occurred during the Execution Style Drill.

213.    Officers knew, and any reasonable officer would know, that a group of all-male police officers cornering and shooting directly at female elementary school teachers over the course of several hours would make Plaintiffs susceptible to emotional distress.

214.    Officers knew, and any reasonable officer would know, that leading teachers into a dark room and having them line up execution style, and then proceeding to shoot at and strike them with bullets at close range multiple times without forewarning or consent, would cause severe emotional distress.

215.    Furthermore, Officers were repeatedly and explicitly alerted to Plaintiffs' emotional distress when plaintiffs cried out in pain upon being shot and showed clear physical signs of distress. Officers never adjusted their behavior to mitigate the emotional distress Plaintiffs experienced, but rather heightened Plaintiffs' distress by laughing and making jokes.

216.    Defendants' conduct was well beyond the bounds of socially tolerable conduct, was outrageous, shocks the conscience and exceeds the bounds of decency to such a degree as to be intolerable in a civilized community.

217.    At no time during the Execution Style Drill were Defendants engaged in the enforcement of a law, rule, or regulation.

218.    Defendants' conduct during the Execution Style Drill directly and proximately caused Plaintiffs to experience emotional distress that was serious in nature and of the kind normally aroused in the mind of a reasonable person.

219.    Defendants' conduct immediately caused Plaintiffs to experience intense emotional upset, extreme fear and anxiety, and humiliation.

220.    The emotional distress experienced by Plaintiffs was long-lasting and is still ongoing. Plaintiffs continue to experience serious emotional distress as a direct result of Defendants' conduct.

## COUNT XII - Indiana State Law Claims for Intentional Infliction of Emotional Distress

### (Against all Defendants for the Rotating Drills)

221.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

222.    White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

223.    Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

224.    Officers acted outrageously and with intent to cause severe emotional distress to Plaintiffs and/or acted in reckless disregard of the probability of causing emotional distress while conducting the Rotating Drills. Officers' conduct did, in fact, proximately cause Plaintiffs to suffer severe and extreme emotional distress.

225.    Defendants abused their position of power, authority, and trust to maximize the emotional distress experienced by Plaintiffs, including, but not limited to, by unnecessarily shooting at Plaintiffs throughout the Rotating Drills, repeatedly screaming expletives at Plaintiffs, and laughing when Plaintiffs showed signs of fear and pain.

226.    Officers knew, and any reasonable officer would know, that such behavior would cause Plaintiffs to experience severe emotional distress.

227.    Defendants' conduct was well beyond the bounds of socially tolerable conduct, is outrageous, shocks the conscience and exceeds the bounds of decency to such a degree as to be intolerable in a civilized community.

228.    At no time during the Rotating Drills were Defendants engaged in the enforcement of a law, rule, or regulation.

229.    Defendants' conduct during the Rotating Drills directly and proximately caused, and continues to cause, Plaintiffs to experience emotional distress that is serious in nature and of the kind normally aroused in the mind of a reasonable person.

## COUNT XIII - Indiana State Law Claims for Negligent Infliction of Emotional Distress
### (Against all Defendants for Execution Style Drills)

230.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

231.    White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

232.    Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

233.    Officers owe a private duty to refrain from using excessive force in the course of their duties. This duty was violated when Officers assaulted and battered citizens elementary school teachers not suspected of any wrongdoing and who posed no threat to officer safety.

234.    By assaulting and battering Plaintiffs in violation of Indiana law, Officers breached their duty to refrain from using excessive force and Officers' conduct fell below the applicable standard of care necessary to avoid assaulting and battering citizens.

235.    Officers' conduct also fell below the proper standard of care for conducting an active-shooter training. Neither the ALICE Training Model, nor known best practices for active-shooter trainings, call for non-law-enforcement participants to be shot during trainings, nor do they call for participants to ever be shot without their consent. The proper standard of care for conducting active-shooter trainings does not call for teachers to be lined up execution style and then shot multiple times at close range without forewarning. The distance from which Plaintiffs were shot fell below the minimal safety requirements for the proper use of airsoft guns.

236.     At no time during the Execution Style Drill were Defendants engaged in the enforcement of a law, rule, or regulation.

237.     Defendants' breach of their duty to refrain from using excessive force directly and proximately caused, and continues to cause, Plaintiffs to experience emotional distress that is serious in nature and of the kind normally aroused in the mind of a reasonable person.

## COUNT XIV- Indiana State Law Claims for Negligent Infliction of Emotional Distress
### (Against all Defendants for Rotating Drills)

238.     Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

239.     White County and/or the WCSD are liable for all of Officers' actions alleged herein under the doctrine of respondeat superior.

240.     Officers' conduct occurred at the direction of and/or within the knowledge and consent of Defendants Shafer and Brooks.

241.     Officers breached their duty to not use excessive force on and batter unarmed citizens, and their conduct fell below all applicable standards of care.

242.     Officers continued to unnecessarily shoot Plaintiffs throughout the Rotating Drills, often at a distance that was below the minimal safety requirement for the proper use of airsoft guns.

243.     At no time during the Rotating Drills were WCSD Officers engaged in the enforcement of a law, rule, or regulation.

244.     Defendants' breach of their duty to refrain from using excessive force directly and proximately caused, and continues to cause, Plaintiffs to experience emotional distress that is serious in nature and of the kind normally aroused in the mind of a reasonable person.

## COUNT XV - 42 USC § 1983 First Amendment Violation –

## Retaliation

### (By Plaintiff Darcy Slade Against Defendants White County and/or WCSD, Bill Brooks and Mark Helms)

245.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

246.    Plaintiffs have a constitutionally protected right to freedom of speech.

247.    Plaintiffs engaged in constitutionally protected speech when, through their union representative, they questioned, criticized or otherwise raised concerns about the Defendant officers' conduct during the Meadowlawn training.

248.    Defendants Helms, Brooks, White County and/or WCSD ("these Defendants") retaliated against Plaintiff Slade for engaging in protected activity by refusing to respond to her requests for in-school law-enforcement assistance.

249.    But-for Plaintiffs' criticism of the Defendant officers' conduct during the Meadowlawn training, either Defendant Helms or another officer of the WCSD would have responded to Ms. Slade's requests for in-school law enforcement assistance.

250.    As a direct and proximate result of these Defendants twice depriving Plaintiff Slade of the assistance she relied upon in order to safely teach her self-contained classroom, Plaintiff Slade suffered a deprivation likely to deter future speech critical of WCSD or any WCSD officer.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Honorable Court find in their favor and against the Defendants and order the following relief to the fullest extent allowed by law:

A.    All relief available under 42 U.S.C. § 1983 and 42 U.S.C. § 1988, including:

a.    Compensatory damages against all Defendants acting in their official and

individual capacities;

    b.    Punitive damages against Defendants Shafer, Brooks, Glover, Helms, Roth, and Morrow acting in their individual capacities;

    c.    Attorneys' fees and costs; and

    d.    All other appropriate relief.

B.    Any and all other damages and relief just and proper under the laws of the State of Indiana, including:

    a.    Compensatory damages against all Defendants acting in their official capacities;

    b.    Attorneys' fees and costs; and

    c.    All other appropriate relief.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, Nicole Baltes, Jeanne Franks, Abby Hare, Breanne Paulik, Talaina Pinkerton, Darcy Slade, Danielle Snyder, and Carrie Zook, by counsel, hereby demand trial by jury.

Respectfully submitted,

Matthew J. Piers
Kate E. Schwartz
Elizabeth Mazur
Hughes Socol Piers Resnick & Dym, Ltd.
70 West Madison Street, Suite 4000
Chicago, Illinois 60602
mpiers@hsplegal.com
kschwartz@hsplegal.com
emazur@hsplegal.com

Eric M. Hylton
Miranda W. Bernadac
Riley Bennett & Egloff LLP
500 N Meridian St., Ste. 550
Indianapolis, IN 46204
ehylton@rbelaw.com
mberadac@rbelaw.com

By: /s/ Kate E. Schwartz
One of Plaintiff's Attorneys

Alice O'Brien
Evan Curdts
National Education Association
1201 16th St NW Ste 819
Washington, DC 20036
aobrien@nea.org
ecurdts@nea.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2021, a copy of this document was filed

electronically.  Notice of this filing will be sent to the following persons by operation of the

court's electronic filing system. Parties may access this filing through the court's system.

| | |
|---|---|
| Matthew B. Knight | James S. Stephenson |
| KNIGHT HOPPE KURNIK & KNIGHT | Pamela G. Schneeman |
| LTD. | STEPHENSON MOROW & SEMLER |
| 5600 N. River Road, Suite 600 | 3077 East 98th Street, Suite 240 |
| Rosemont, IL 60018-5114 | Indianapolis, IN 46280 |
| mknight@khkklaw.com | pschneeman@stephlaw.com |
| | jstephenson@stephlaw.com |

/s/ Kate E. Schwartz

| | |
|---|---|
| Alice O'Brien | Matthew J. Piers |
| Evan Curdts | Kate E. Schwartz |
| National Education Association | Elizabeth Mazur |
| 1201 16th Street, NW | Hughes Socol Piers Resnick & Dym, Ltd. |
| Washington, D.C. 20036 | 70 West Madison Street, Suite 4000 |
| aobrien@nea.org | Chicago, Illinois 60602 |
| ecurdts@nea.org | mpiers@hsplegal.com |
| | kschwartz@hsplegal.com |
| | emazur@hsplegal.com |

Eric M. Hylton
Miranda W. Bernadac
Riley Bennett & Egloff LLP
500 N Meridian St., Ste. 550
Indianapolis, IN 46204
ehylton@rbelaw.com
mberadac@rbelaw.com